DONALD C. SIMMONS *v.* JOHN J. BUDDS ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued October 9—decided December 4, 1973

*Norman J. Voog,* with whom was *Donald C. Simmons,* pro se, for the appellant (plaintiff).

*John G. Hill, Jr.,* assistant attorney general, with whom, on the brief, was *Robert K. Killian,* attorney general, for the appellee (defendant University of Connecticut).

HOUSE, C. J. The plaintiff, Donald C. Simmons, is a tenured associate professor of anthropology serving at the University of Connecticut's Hartford campus. He brought this action seeking mandamus and injunctive relief to compel the defendants, who are the university's chairman of the board of trustees, the president, the provost, the dean of students and the registrar, to restore any grade marks given by the plaintiff to his students and subsequently changed without the plaintiff's consent, and to refrain from granting course credit to any student enrolled in the plaintiff's courses who did not take a final examination therein for the 1970 spring term of the academic year 1969–70.

The basic facts are not in dispute. On May 8, 1970, a special meeting of the university senate, which is composed of the president and faculty members, was called as a result of a student strike, agitation and unrest which prevailed at the university's main campus in Storrs. The student strike was allegedly in response to events in Indochina and at Kent State University in Ohio. Final examinations were scheduled to commence on May 18, 1970.

At the emergency meeting, the first in over thirty years, the university senate, by voice vote, adopted grading regulations for the 1970 spring term which provided, inter alia: that instructors could not in any way penalize students for absenting themselves from classes between May 5 and May 15, 1970; that, while any student who so desired could take a regularly scheduled final examination, it would be based only on course work covered before May 5, 1970; and that students who had a passing grade on May 5, 1970, could, by electing not to take a final examination, take instead a course grade of "S." The designation "S," meaning satisfactory, had formerly been the mark which a student received if, at the beginning of a course, the student had elected a "pass-fail" option and had passed the course after taking the final examination. An "S" grade entitled its recipient to course credit. The new grading regulations altered the existing policy of the University of Connecticut in that, previously, it was the instructor who determined whether a student was passing a course, and a student did not receive a grade without offering evidence as to what the grade should be. The trial court found that the new grading regulations permitted many students to

pass who would have otherwise failed, and that students enrolled in the plaintiff's course who neither completed the course requirements nor demonstrated that they possessed sufficient knowledge of the course were nevertheless awarded full course credit by the university.

The plaintiff began teaching at the University of Connecticut in 1957. It had been his policy to announce at the first class of the semester that a final examination in his courses was required to be taken and passed by the students in order to receive course credit. As a matter of academic policy, the plaintiff presumed each student to be failing until the student rebutted this presumption by passing the mandatory final examination. The plaintiff refused to comply with the regulations adopted on May 8, 1970, as they pertained to allowing students to elect a course grade of "S" rather than to take a final examination, and he marked absent ("ABS") on the grade sheets of those students who did not take his final examination. Prior to May 8, 1970, a marking of absent would have been converted into a failing mark, "F," unless the student took another examination or completed some equivalent project satisfactorily. Of 220 students in his classes, the plaintiff marked as "absent" twenty who failed to take the final examination. Five of the twenty took another examination later and were given appropriate letter marks. In November, 1970, the defendant Edward V. Gant, provost of the university, directed the defendant Ronald E. Dickerson, registrar, to change the grades of the remaining fifteen students from "absent" to "S." It was this direction which precipitated the present action which the trial court expressly found was brought by the plaintiff "not to

penalize students but because he did not want the professional integrity of his courses invaded for political reasons."

The trial court denied the relief sought by the plaintiff, and the plaintiff has assigned as errors the court's conclusions that the temporary regulations were lawfully adopted by the university senate acting within the scope of its delegated powers; that the regulations were not violative of either the Connecticut constitution or of the United States constitution; that the regulations were not invalid as being arbitrary and capricious; and that § 53-153 of the General Statutes which proscribes the alteration of official records was inapplicable.

The University of Connecticut was established as the Storrs Agricultural School by the General Assembly in April, 1881. Public Acts 1881, c. 74, p. 40. The constitution of Connecticut as adopted in 1965, article eighth, § 2, empowers the General Assembly to "determine the size, number, term and method of appointment of the governing boards of The University of Connecticut . . . ." The General Assembly has conferred upon the governor, under § 10-118 of the General Statutes, the responsibility of appointing the members of the university's board of trustees, who, under § 10-119, "shall make rules for the government of the university and shall determine the general policies of the university . . . ."

Pursuant to its statutory directive, the board of trustees delegated to the university senate the authority to establish rules and regulations for the undergraduate schools.[1]

---

[1] "The University Senate is a legislative body and concerns itself with minimum rules and general regulations pertaining to all undergraduate schools and colleges and with policy insofar as it pertains,

The rules and regulations of the university senate govern undergraduate markings, examination requisites and course credit requirements. The by-laws of the university senate prescribe that its rules and regulations "may be changed at any regular meeting of the Senate by a majority vote of those present and voting, provided, however, that due warning has been given in the call that proposed changes in the rules and regulations are to be considered. If due warning has not been given, a two-thirds vote of those present and voting shall be required." Univ. of Conn. Bull., "Laws and By-Laws" (9th Ed.), pp. 56–57. The parties stipulated that due warning of the special meeting held May 8, 1970, was not given. For this reason, a two-thirds majority vote was required to change the rules and regulations, and it is the plaintiff's contention that there is no way of knowing what the voice vote to change the grading regulations was, and accordingly that the motion to adopt the changes cannot be considered to have been passed properly.

The atmosphere surrounding the May 8, 1970, meeting was conducive to uncertainty. Nine students were given permission to attend the meeting. One of the students who was president of the student government, a coordinator of the student strike and one of those to whom the plaintiff gave a marking of absent, testified that he could not ascertain by looking or listening whether a two-thirds majority approved the motion. He attributed the difficulty to the circumstance that some 500 students who were watching the proceeding on closed circuit

in a general way, to the educational program of the institution and is not reserved to the Board of Trustees, to the administration, or to the several faculties." Univ. of Conn. Bull., "Laws and By-Laws" (9th Ed.), p. 15.

television in an adjoining room could be heard inside the meeting room noisily yelling to indicate agreement or disagreement with certain points during the senate's debate and deliberation. Nevertheless, no request was made for a head count upon the announcement of the result of the voice vote. The senate accepted the result without challenge, and the minutes of the meeting state that the motion to adopt the new regulations carried. The trial court concluded that the regulations were lawfully adopted by the university senate acting within the scope of its delegated powers.

We will not find error in the trial court's conclusions that the grading changes were adopted by the requisite majority under its delegated authority unless they are "legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case." *Gutowski* v. *New Britain,* 165 Conn. 50, 54, 327 A.2d 552. Neither circumstance exists here.

Next, the plaintiff submits that even if the new grading regulations were properly adopted, they constituted an arbitrary and capricious use of the university as an instrument to promote a particular political viewpoint which impinged upon normal classroom teaching, examination and grading. He also contends that the actions of the university senate are violative of article eighth, § 2, of the constitution of Connecticut which states that the University of Connecticut "shall be dedicated to excellence in higher education." It is the plaintiff's contention that the actions of the university senate were not consonant with this constitutional mandate since the action was political and not educational and was "an unreasonable exercise of the University Senate's power."

Although the minutes of the May 8, 1970, meeting reveal substantial political motivation by those who strongly advocated an administration response to the student strike, it cannot be held as a matter of law that the enactment of new examination and scholastic evaluation requisites was not related in a general way to the educational program of the institution, and, therefore, such action was properly within the jurisdiction of the university senate.

The use of the word "excellence" in article eighth, § 2, of the constitution of Connecticut was inserted with the expectation that the University of Connecticut would serve as a model of excellence for the state system of higher education. See 3 Proceedings of the Connecticut Constitutional Convention (1965), p. 1062. It was intended that the board of trustees and the administrators were to be free to decide what is wise in educational policy. Id., p. 1048; 15 Am. Jur. 2d, Colleges and Universities, § 7. Corrective action, if warranted, lies within the provinces of the board of trustees from whom the university senate's authority is derived, the governor who appoints the trustees under § 10-118 of the General Statutes, and, ultimately, with the General Assembly to which the constitution of Connecticut, article eighth, § 2, entrusts the responsibility of governing the University of Connecticut. We find no error in the conclusion of the trial court that the constitutional standard of "excellence" was not meant to be a wedge for penetration of the educational establishment by judicial intervention in policy decisions.

We also find no error in the conclusion of the trial court that § 53-153 of the General Statutes prohibiting the willful and corrupt alteration of the records

of a state institution is inapplicable to the changes made in students' grades since, as the court found, the university provost acted without dishonest purpose.

We also find no merit to the plaintiff's assertion that his rights under the equal protection and due process clauses of the fifth and fourteenth amendments to the constitution of the United States were abridged. Obviously the actions of the university senate were offensive to the plaintiff's philosophical and pedagogical principles but the issue before the court was not whether the action of the university senate was in accordance with good educational policy but whether it was legal and whether the plaintiff was entitled to the relief which he sought by way of an injunction and a writ of mandamus. Relief by way of mandatory injunction is an extraordinary remedy granted in the sound discretion of the court and only under compelling circumstances. *Morrison* v. *Work,* 266 U.S. 481, 490, 45 S. Ct. 149, 69 L. Ed. 394; *Scoville* v. *Ronalter,* 162 Conn. 67, 74, 291 A.2d 222; *Herbert* v. *Smyth,* 155 Conn. 78, 85, 230 A.2d 235. "There must not only be a violation of the plaintiff's rights, but such a violation as is, or will be, attended with actual or serious damage." *Crouchley* v. *Pambianchi,* 152 Conn. 224, 227, 205 A.2d 492; 42 Am. Jur. 2d, Injunctions, §§ 23–30. Mandamus "lies only to enforce the performance of ministerial, as opposed to discretionary, duties by public officials. '. . . Where the official or agency is authorized to exercise a discretionary power, mandamus does not lie. *Hannifan* v. *Sachs,* 150 Conn. 162, 167, 187 A.2d 253. . . . Relief by way of mandamus, therefore, is only available to one who has a complete and immediate right that the public act be done. *Ballas* v. *Woodin,* 155 Conn.

283, 284, 231 A.2d 273.' *Waterbury Teachers Assn.* v. *Furlong*, 162 Conn. 390, 414, 294 A.2d 546. The party seeking performance of the duty has the burden of establishing his clear legal right to performance. *Waterbury Teachers Assn.* v. *Furlong*, supra; *Boyko* v. *Weiss*, 147 Conn. 183, 186, 158 A.2d 253." *Lechner* v. *Holmberg*, 165 Conn. 152, 157, 328 A.2d 701. As this court said in *Hannifan* v. *Sachs*, 150 Conn. 162, 167, 187 A.2d 253: "If a public officer or board acts within the scope of the delegated authority and honestly and fairly exercises his or its judgment in performing his or its function, mandamus is not available to review the action taken or to compel a different course of action. *Keim* v. *United States*, 177 U.S. 290, 294, 20 S. Ct. 574, 44 L. Ed. 774; *State ex rel. Heimov* v. *Thomson*, . . . [131 Conn. 8, 12, 37 A.2d 689]; *State ex rel. Baker* v. *Toledo State Hospital*, 88 Ohio App. 348, 351, 100 N.E.2d 265; *Souder* v. *Philadelphia*, 305 Pa. 1, 8, 156 A. 245."

We find no error in the ultimate conclusion of the trial court that the plaintiff has not established that he is entitled to any of the relief requested.

There is no error.

In this opinion the other judges concurred.