IRVING STOLBERG *v.* J. EDWARD CALDWELL
IRVING STOLBERG *v.* LAWRENCE J. DAVIDSON ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued June 9—decision released August 8, 1978

588

*Louis M. Winer,* with whom, on the brief, was *J. Michael Sulzbach,* for the appellant (plaintiff in each case).

*Bernard F. McGovern,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellees (defendants).

COTTER, C. J. These cases were consolidated and come to the Supreme Court upon a reservation of facts and questions of law pursuant to § 52-406 of the General Statutes as an agreed case in which the parties agree upon the facts on which the controversy depends and submit the same to this court. The plaintiff has been and continues to serve as a member of the faculty and professional staff at Southern Connecticut State College. In the fall of 1970, he was elected a member of the House of Representatives of the General Assembly and has been reelected in each subsequent biennial election.

The defendant in the first action is the comptroller of the state of Connecticut. In the second action, the defendants are the chairman of the board of trustees for the state colleges of the state of Connecticut, the members of the board of trustees of such colleges, the state comptroller, and the auditors of public accounts of the state of Connecticut.

Pursuant to the statute the parties have submitted, inter alia, the following facts upon which the controversy depends: The plaintiff served as

a member of the faculty and professional staff at Southern Connecticut State College (Southern Connecticut) during the academic years 1966–1967 through 1968–1969, inclusive. Effective at the end of the academic year 1968–1969, he was dismissed from his position at Southern Connecticut and during the academic years 1969–1970 through 1973–1974, inclusive, he served as a member of the faculty at Quinnipiac College in Hamden. In 1969, he commenced a federal civil rights action seeking reinstatement with tenure and other relief, claiming that the termination of his position at Southern Connecticut was violative of his rights under the first and fourteenth amendments of the United States constitution. In the fall of 1970, the plaintiff ran for and was elected to a seat in the House of Representatives of the General Assembly, representing the 93rd assembly district. He has been reelected to that seat in each subsequent biennial election and has held that seat pursuant to such election.

In March of 1972, the United States District Court for the district of Connecticut rendered judgment in the federal civil rights action referred to above, ordering that the board of trustees for the state colleges of the state of Connecticut (board of trustees) reinstate the plaintiff with tenure. Pursuant to that judgment, he was reinstated by the board of trustees, and at the commencement of the 1974–1975 academic year he returned to his faculty position at Southern Connecticut with tenure, as provided for under the rules and regulations adopted and promulgated by the board of trustees. He has served and continues to serve in that position. He was paid for his faculty services through part of November, 1974, at which time salary payments were discontinued, although the board of

trustees continued to maintain his position at Southern Connecticut and to submit his name regularly on the biweekly certified payrolls for Southern Connecticut. Each of these payrolls certified that "[a]ll employees listed herein have been regularly appointed to authorized positions and have rendered the services for which payment is to be made."

The plaintiff has rendered his services with the intention and expectation that he would receive salary payments therefor. He claims that he is entitled to such payments, and he has made demand for them. The defendant comptroller of the state of Connecticut and his predecessor in office have withheld and refused to deliver the plaintiff's faculty salary payments since November of 1974, solely upon the assertion that Southern Connecticut is within the executive department of state government; that the plaintiff's simultaneous service as a member of the General Assembly and as a member of the faculty and professional staff of Southern Connecticut is therefore violative of § 11 of article third of the constitution of the state of Connecticut and § 2-5 of the General Statutes; and that the plaintiff has therefore impliedly relinquished his faculty position.

The plaintiff has framed the issues as presented in his brief as follows: that Connecticut's state colleges are independent and autonomous state institutions, the faculties and professional staffs of which are not within the judicial, legislative, or executive department of the state government, and consequently neither the constitutional nor the statutory dual-job ban applies; that if his faculty position is in any of the three constitutional departments, it is

in the legislative department, and, in the circumstances of this case, he is not violating either ban; that he has not impliedly relinquished his state college faculty position; that the dual-job bans are constitutionally invalid because (a) they do not survive applicable strict equal protection scrutiny; (b) they are void for vagueness; and (c) they do not survive applicable first amendment overbreadth scrutiny; and that Connecticut's comptroller is under a ministerial duty to pay the plaintiff's state college faculty salary.[1]

---

[1] The specific questions, as renumbered by this court, upon which advice is desired are:

1. Is the plaintiff's position as a member of the faculty and professional staff of Southern Connecticut State College:

(a) within the judicial department for purposes of the application of section 11 of article third of the constitution of the state of Connecticut;

(b) within the judicial department for purposes of the application of section 2-5 of the General Statutes;

(c) within the legislative department for purposes of the application of section 11 of article third of the constitution of the state of Connecticut;

(d) within the legislative department for purposes of the application of section 2-5 of the General Statutes;

(e) within the executive department for purposes of the application of section 11 of article third of the constitution of the state of Connecticut;

(f) within the executive department for purposes of the application of section 2-5 of the General Statutes?

2. (a) If the answer to question 1 (c) above is yes, may the plaintiff continue to serve as a member of the faculty and professional staff of Southern Connecticut without violating section 11 of article third of the constitution of the state of Connecticut, because said section does not bar the plaintiff from holding or accepting a position or office in the legislative department during the term for which he is elected a member of the General Assembly?

(b) If the answer to any of questions 1 (b), 1 (d), or 1 (f) above is yes, may the plaintiff continue to serve as a member of the faculty and professional staff of Southern Connecticut without violating section 2-5 of the General Statutes, because said section does not bar the plaintiff from simultaneously holding a position in the judicial, legislative, or executive department of the state government

I

Article third, § 11 of the Connecticut constitution, which prohibits a legislator from holding an appointive position in the executive or judicial departments of state government, provides in per-

and a seat in the General Assembly, if he was elected to the General Assembly and took his seat there while holding the former position?

3. Can the plaintiff's position as a member of the faculty and professional staff of Southern Connecticut be impliedly relinquished by the plaintiff's becoming a member of the General Assembly?

4. If the answer to question 3 above is yes, and if the plaintiff is in violation of section 11 of article third of the constitution of the state of Connecticut and/or section 2-5 of the General Statutes, does the plaintiff nonethelesss continue to maintain his position as a member of the faculty and professional staff of Southern Connecticut because the doctrine of implied relinquishment of office operates to cause the plaintiff to relinquish his seat in the General Assembly each time he returns to his position at Southern Connecticut after the commencement of each term for which he was elected to the General Assembly?

5. If the answer to question 4 above is no, are section 11 of article third of the constitution of the state of Connecticut and/or section 2-5 of the General Statutes, as applied to the plaintiff in the circumstances herein, overbroad and violative of the plaintiff's rights under the equal protection clause of the United States constitution and the coordinate provisions of the constitution of the state of Connecticut?

6. If the answer to question 4 above is no, are section 11 of article third of the constitution of the state of Connecticut and/or section 2-5 of the General Statutes, as applied to the plaintiff in the circumstances herein, violative of the plaintiff's rights under the first amendment and due process clause of the United States constitution and coordinate provisions of the constitution of the state of Connecticut?

7. If the answer to question 4 above is no, are section 11 of article third of the constitution of the state of Connecticut and/or section 2-5 of the General Statutes, as applied to the plaintiff in the circumstances herein, unduly vague and violative of the plaintiff's rights under the due process clause of the United States constitution and coordinate provisions of the constitution of the state of Connecticut?

8. May the defendant comptroller of the state of Connecticut refuse to make salary payments to the plaintiff solely upon the claim that the plaintiff, by holding a faculty appointment and position at Southern Connecticut while a member of the General Assembly, is in violation of section 11 of article third of the constitution of the state of Connecticut and section 2-5 of the General Statutes?

tinent part: "No member of the general assembly shall, during the term for which he is elected, hold or accept any appointive position or office in the judicial or executive department of the state government, or in the courts of the political subdivisions of the state, or in the government of any county." [2] The statutory dual-job ban, General Statutes § 2-5, provides: "No member of the general assembly shall, during the term for which he is elected, be nominated, appointed or elected by the governor, the general assembly or any other appointing authority of this state to any position in the judicial, legislative or executive department of the state government, except as provided in this section. The provisions of this section shall not apply where it is expressly provided by law that a member of the general assembly as such shall be nominated or appointed to any board, commission, council or other agency in the legislative department." [3]

Since the statutory provision contained in § 2-5 only prohibits the appointment of one already a state legislator to a position in one of the three departments of our government, it has no application to the plaintiff in the present case because his employment as a teacher at Southern Connecticut commenced during the 1966–1967 academic year, i.e., prior to his election. Although the plaintiff's position was terminated in 1969, the United States District Court for the district of Connecticut, in a judgment rendered in 1972, declared his discharge unconstitutional and ordered him reinstated with tenure and back pay in order to " 'put him in as good a

[2] The dual-job ban provision was first made part of the constitution on August 5, 1955, as article tenth, § 6 of the 1955 constitution.

[3] The statutory ban was first enacted in 1953. Public Acts 1953, No. 368, § 157.

position as he would have occupied but for the unconstitutional infringement of his first amendment rights.'" *Stolberg* v. *Members of Board of Trustees,* 541 F.2d 890, 892 (2d Cir.). The plaintiff ran for, and was elected to, a term of office in the General Assembly beginning in 1971. Because the termination of the plaintiff's employment as a teacher was adjudged by the court to have been invalid, his reinstatement pursuant to the 1972 judgment cannot be considered an appointment of one who is already a state legislator.

The constitutional provision may, however, be applicable since the plaintiff's status as a teacher is an "appointive position" within the meaning of the constitutional provision. While the common meaning of the word "appoint" is "[t]o assign, designate"; Webster, New International Dictionary (2d Ed.); the word also connotes authority to place in office. The fact that the position to which the plaintiff was appointed was not, in the legal sense, an office but merely an employment does not render the dual-job ban inapplicable under the facts presented since an employee can be said to have been assigned or designated to do a certain job. *McAdams* v. *Barbieri,* 143 Conn. 405, 417, 123 A.2d 182. Moreover, the term "position" as used in § 5-196 (u) of the General Statutes, dealing with state employees, is defined as "a group of duties and responsibilities currently assigned or designated by competent authority to require the services of one employee." Hence, article third, § 11, in its reference to a "position or office," cannot be said to be limited to office-holding alone—it was clearly intended to encompass state employment generally. Further, since the board of trustees of the state colleges is authorized under § 10-109b of the General

Statutes to appoint executive officers and to employ faculty members of the state colleges, the plaintiff's status as a teacher is an "appointive position" within the meaning of the constitutional provision.

## II

Initially we consider article second of the Connecticut constitution since the basic claims of the plaintiff involve certain historic and fundamental principles as to the respective powers of the legislative, judicial and executive departments under the state constitution. The provisions of article second, which were carried from the constitutions of 1818 and 1955, separate the powers of government into three distinct departments as follows: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Prior to the adoption of the state's first constitution in 1818, the legislative, executive and judicial powers had been centered in, and exercised by, the General Assembly and its predecessor, the General Court. It is significant to note that the constitution represented a grant of power from the people, in whom all power originally resided, that the powers granted to the legislature are legislative only, those granted to the judiciary are judicial only, those granted to the executive are executive only, and that such powers are complete except as restricted by the state or federal constitution. *Adams* v. *Rubinow,* 157 Conn. 150, 153–54, 251 A.2d 49; *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 587, 37 A. 1080, 38 A. 708; see *Afroyim* v. *Rusk,* 387 U.S. 253, 257, 87 S. Ct. 1660, 18 L. Ed. 2d 757.

Although, as Chief Justice King remarked in the *Adams* case, "grave constitutional questions cannot be so easily solved," the language of the constitution of Connecticut controverts any intention to provide for a distribution of powers of government to a separate, fourth magistracy of government outside those three clearly defined in article second. There is no hint of an intent to establish Connecticut's state colleges as independent and autonomous state institutions, the faculties and professional staffs of which are deemed outside the judicial, legislative or executive department of the state government. While it is often true that the powers granted to the departments of government necessarily overlap to some extent; *In re Application of Clark,* 65 Conn. 17, 38, 31 A. 522; and that the concept of separation of powers is not one that is capable of precise legal definition yielding clear solutions to intragovernmental disputes; see *Nixon* v. *Administrator of General Services,* 433 U.S. 425, 441-46, 97 S. Ct. 2777, 53 L. Ed. 2d 867; neither this apparent commingling of functions and duties nor the potential for any uncertainty compels us to conclude that a new and separate branch of government has been created. See *Powers* v. *Hotel Bond Co.,* 89 Conn. 143, 147-49, 93 A. 245. In *Powers,* for example, this court pointed out that, under the new system established by the legislature pursuant to the Workmen's Compensation Act of 1913, the compensation commissioner was not a court but an executive officer engaged in administrative duties in spite of the fact that he performed some duties which were quasi judicial in nature.

In addition to the use of the phrases "distribution of powers" and "the powers of government" in article second, article third speaks of "legislative

power" in defining the legislative department, article fourth, concerning the executive department, is interlaced with references to the distribution and use of "power," and article fifth, in establishing the judicial department, likewise employs the use of the words "power" and "powers." Since all the powers initially residing in the people were granted to these three departments of state government, no additional powers remained to be distributed.

In contradistinction, article eighth of our constitution provides in part: "Sec. 1. There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation. Sec. 2. The state shall maintain a system of higher education, including The University of Connecticut, which shall be dedicated to excellence in higher education. The general assembly shall determine the size, number, terms and method of appointment of the governing boards of The University of Connecticut and of such constituent units or coordinating bodies in the system as from time to time may be established." It contains no reference to the distribution or use of power nor does it indicate that the framers of the constitution intended to create a separate department of education within the state government.

In dealing with constitutional provisions we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state. *Cahill* v. *Leopold*, 141 Conn. 1, 19, 103 A.2d 818; 1 Cooley, Constitutional Limitations (8th Ed.) p. 125. Unless there is some clear reason for not doing so, effect must be given to every part

of and each word in the constitution. The plain, meticulous and historic choice of language clearly conveys grants of power solely to the three departments of government. Such language does not appear in the original or later constitutional provisions concerning education in article eighth, first embodied in the constitution adopted in 1818, later in those of 1955 and 1965.

It is a basic principle of constitutional law that one department cannot interfere with or encroach on either of the other departments. *State* v. *Stoddard,* 126 Conn. 623, 627, 13 A.2d 586. The division of governmental powers among the three departments, the legislative, the executive and the judicial, each separate from the others but subject to regulations by law touching upon the discharge of duties required to be performed, is one of the fundamental principles of the American constitutional system. *Evans* v. *Gore,* 253 U.S. 245, 40 S. Ct. 550, 64 L. Ed. 887. This means that the general functions of government fall into the three departments outlined. Such provisions have as their primary purpose the prevention of a commingling of essentially different powers of government in the same hands; *O'Donoghue* v. *United States,* 289 U.S. 516, 530–31, 53 S. Ct. 740, 77 L. Ed. 1356; so that the principle of the separation of powers operates in a broad manner to confine the legislative, executive and judicial powers to each department within the limits set forth by the constitution. *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 587, 37 A. 1080, 38 A. 708.

It is manifest from the extensive legislation relating to the furnishing of education for the general public that it is a state function and duty under our law. *West Hartford Education Assn., Inc.* v.

*DeCourcy,* 162 Conn. 566, 573, 295 A.2d 526; *Board of Education* v. *D'Aulisa,* 133 Conn. 414, 418, 52 A.2d 636. Since early times the state has had a continuous interest in education; the duty of providing for the education of children was always regarded as a duty resting on the state, and there was no question that the legislature had the plenary power to create, consolidate and abolish school districts. *State ex rel. Walsh* v. *Hine,* 59 Conn. 50, 60, 21 A. 1024. Without distributing and dividing the powers of government so as to create a distinct, separate fourth magistracy, the state exercised its broad, sovereign power in legislating concerning educational matters. The Connecticut education system has developed from the small, practically independent school district through a consistent legislative policy of consolidating and centralizing schools and their administration. Thus, "[t]he determination of the state policy in a matter of this kind is for the General Assembly." *Regional High School District No. 3* v. *Newtown,* 134 Conn. 613, 617, 59 A.2d 527.

The adoption, in 1965, of a new § 2 to article eighth of our state constitution cannot be held to have changed this fundamental structuring of our governmental system. Prior to that date, the state's system of higher education had been established and had existed pursuant to legislation originating in 1849. Public Acts 1849, c. 23. In 1965, separate legislation established "the state system of higher education" the constituent units of which included, inter alia, the University of Connecticut and its branches and the state colleges. Public Acts 1965, No. 330, § 1. The authority and responsibility for the operation of the state's public institutions were vested in the boards of trustees of the various "constituent units"; § 4; while the coordination and

planning for higher education was to be the responsibility of a commission for higher education, some of the members of which were appointed by the governor, while others consisted of one member of each board of trustees within the state system. § 2. Subsequent to the enactment of Public Act No. 330, the 1965 constitutional convention revised § 2 of article eighth to read as follows: "The state shall maintain a system of higher education, including The University of Connecticut, which shall be dedicated to excellence in higher education. The general assembly shall determine the size, number, terms and methods of appointment of the governing boards of The University of Connecticut and of such constituent units or coordinating bodies in the system as from time to time may be established." Since, pursuant to Public Act No. 330, the general assembly had already determined the size, number, terms and methods of appointment of the governing boards or coordinating bodies in the state system, the constitutional provision was merely an affirmation of the existing legislative authority exercised by the general assembly in the structuring of our state system of higher education.

In 1977, the state system of higher education was restructured once again, pursuant to Public Acts 1977, No. 77-573. A board of higher education was established and was to be composed of members appointed by the governor along with those appointed by the leaders of the general assembly. § 2 (a). The duties of the board include establishing the state-wide policy for the state's systems of higher education as well as those powers and duties formerly provided to the commissioner for higher education. § 25. Specifically, the duties and responsibilities of the board of higher education include:

preparing and presenting to the governor and general assembly a consolidated public higher education budget from those individual budgets submitted by the individual boards of trustees; §§ 6 (a) (1), 7 (a); reviewing and approving plans received from the constituent unit boards; § 6 (a) (3); developing criteria to ensure acceptable quality in programs and institutions and enforcing standards through licensing and accreditation; § 6 (a) (4); initiating and approving changes in tuition and fee schedules; § 8; preparing a master plan for public higher education; § 6 (c); settling disputes between boards of trustees; § 19; and approving leases made by the constituent units. § 19. The board of higher education, therefore, like its predecessor the commission for higher education, generally directs and oversees the system of higher education in this state.

That the state board of higher education is within the executive department cannot now be seriously open to question. Public Acts 1977, No. 77-614, entitled "An Act Concerning the Reorganization of the Executive Branch of State Government," specifically provides that the state board of higher education "shall be within the executive branch of the state government." § 3. Since this enactment is merely a "reorganization" of "existing state agencies into a reasonable number of departments" in order to "eliminate duplication of effort within the executive branch of state government"; § 2 (a); we may infer that, prior to 1977, the commission on higher education was similarly considered to be within the executive branch.

As noted earlier, the board of higher education has a wide variety of duties and responsibilities

regarding control and supervision over the system of higher education in this state generally and, more particularly, over the boards of trustees of the constituent units. Having observed that the state board of higher education is unequivocably within the executive department of our government, therefore, it must logically follow that the "constituent units" and their separate governing bodies similarly fall within that department for the purposes of the dual-job ban provisions.[4]

The plaintiff places much reliance upon the fact that the General Statutes impose a wide range of authority with the individual boards of trustees of the various institutions. The boards of trustees, for instance, have "sole jurisdiction" over the appointment, salaries, termination, rank and status of the teachers at their respective institutions within the limits and the available funds. Public Act No. 77-573, § 14. Further, the trustees are entrusted with responsibility for providing certain degree programs at their institutions. Id., § 16. This independence conferred upon the boards of trustees, however, does not, as the plaintiff suggests, support his assertion that state colleges are autonomous institutions which are not within any one of the three departments of government delineated in article second of our constitution.

Education in general holds a unique place in our society and "is perhaps the most important function

---

[4] Although the plaintiff argues that the state board is not a part of the state system of higher education and that the various institutions are "constituent units" only of the state system, we note that General Statutes § 5-160, as amended by Public Acts 1977, No. 77-573, § 21 (g) (dealing with the state retirement plan) refers to teachers "employed by the board of higher education or *any of its constituent units.*" (Emphasis added.)

of state and local governments." *Brown* v. *Board of Education,* 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873. As a result, it is understandable that the control over day-to-day operations of the institutions of higher education in this state remains with the various boards of trustees so that they may be free to exercise independent judgment unfettered by political considerations. By virtue of article eighth, § 2, of our constitution, for instance, "[i]t was intended that the board of trustees and the administrators [of the University of Connecticut] were to be free to decide what is wise in educational policy." *Simmons* v. *Budds,* 165 Conn. 507, 514, 338 A.2d 479. Similar considerations are applicable to the other state institutions of higher education.

Although the legislative branch, the general assembly, is, through article eighth, § 2, of the constitution, responsible for determining the size, number, terms and method of appointment of the governing boards of the constituent units of our system of higher education, the basic constitutional provision requiring the state to maintain a system of higher education is not necessarily self-executing since, by implication, it requires additional legislative action to implement its purpose. *State ex rel. Cotter* v. *Leipner,* 138 Conn. 153, 158, 83 A.2d 169; 1 Cooley, Constitutional Limitations (8th Ed.) p. 165. The constitutional provision is, therefore, made effective by the requisite legislation—namely, by the provisions contained in title 10 of the General Statutes.

It is the province of the legislative department of our government, therefore, to determine the general public policy in the area of higher education, but such policy is to be applied by the executive

branch. See *Colgate-Palmolive-Peet Co.* v. *National Labor Relations Board*, 338 U.S. 355, 363, 70 S. Ct. 166, 94 L. Ed. 161. It is through the teacher that this state's standards of educational excellence are disseminated. "When so engaged, . . . [he is] exercising one of the functions of the executive department of our state government." *Monaghan* v. *School District No. 1*, 211 Ore. 360, 376, 315 P.2d 797; see *Galer* v. *Board of Regents of the University System*, 239 Ga. 268, 269, 236 S.E.2d 617; 68 Am. Jur. 2d, Schools, § 129.

"There is no suggestion made here that . . . [the plaintiff] has by reason of his dual positions as a legislator and a teacher, used either to the detriment of either department of government, the legislative or executive, nor do we impute to him any unworthy motive in his desire to retain both places at the same time. Our concern is not with what has been done but rather what might be done, directly or indirectly, if one person is permitted to serve two different departments at the same time. The constitutional prohibition is designed to avoid the opportunities for abuse arising out of such dual service whether it exists or not." *Monaghan* v. *School District No. 1*, supra.

In view of the unique and extremely important place of education in our system of government, we are compelled to resolve all doubts regarding the possibility of incursions of the legislature into the area occupied by education as an administrative function of the executive department in favor of "a decisive separation of these powers." Id., 375.

We conclude, therefore, that the plaintiff's employment violates the constitutional dual-job ban.

## III

Having determined that the plaintiff's status as both a state college professor and a state legislator violates the Connecticut constitutional dual-job ban, we consider his claim that his election to the legislature did not invoke the operation of the doctrine that he had impliedly relinquished his state college faculty position. Under the common law, it is well settled that a person may not simultaneously hold two offices which are incompatible, and when one accepts and qualifies for a second office which is incompatible with the first, he vacates, or by implication resigns, the first. *State ex rel. Butera* v. *Lombardi,* 146 Conn. 299, 302, 150 A.2d 309; *State ex rel. Schenck* v. *Barrett,* 121 Conn. 237, 242, 184 A. 379. Where, however, the holding of two offices or positions at the same time is forbidden by constitution or statute, "an incompatibility is created similar in its effect to that of the common law, and as in the case of the latter, the acceptance of the second office [or position] operates ipso facto to vacate the first. Mechem, Public Officers § 429; 67 C.J.S. 149, § 23." *State ex rel. Butera* v. *Lombardi,* supra, 302–303. Where, as here, the illegality of holding the two positions is declared by a constitutional provision, no factual incompatibility need be shown. Ibid.; 63 Am. Jur. 2d, Public Officers and Employees, § 63.

At the end of the academic year 1968-1969, the plaintiff in the present case was dismissed from his teaching position at Southern Connecticut. In 1969, he commenced a federal civil rights action seeking reinstatement with tenure and other relief claiming that the termination of his position was violative of

his constitutional rights. In the fall of 1970, the plaintiff ran for and was elected to a seat in the House of Representatives of the General Assembly. In March of 1972, the United States District Court for the district of Connecticut rendered judgment in the plaintiff's favor; *Stolberg* v. *Members of Board of Trustees,* Civil No. 13,591 (D. Conn.), aff'd in part, 474 F.2d 485 (2d Cir.); and, pursuant to that judgment, he was reinstated by the board of trustees and returned to his faculty position with tenure.[5]

Since the purpose of the judgment of the district court was to " 'put . . . [the plaintiff] in as good a position as he would have occupied but for the unconstitutional infringement of his first amendment rights' "; *Stolberg* v. *Members of Board of Trustees,* supra, 892; the effect of that decision was to render the plaintiff's termination invalid and thus to restore him to his teaching position as of 1969. Hence, when he commenced his term of office in the General Assembly in 1971, the constitutional dual-job prohibition created an incompatibility of positions necessitating the application of the doctrine of implied relinquishment. *State ex rel. Butera* v. *Lombardi,* supra.

In his brief, the plaintiff argues that the common-law doctrine has no application in the present case since: (a) § 10-329a of the General Statutes expressly provides that the state college trustees have sole jurisdiction over the termination of

---

[5] In a later unpublished opinion, the judgment of the District Court was clarified to indicate that the dual-job ban claim was not an issue in the case and, consequently, that judgment did not prejudice the state's right to assert its constitutional dual-job ban against the plaintiff. See *Stolberg* v. *Members of Board of Trustees,* 541 F.2d 890, 892 (2d Cir.).

faculty members; (b) the trustees have continued his appointment and continued to submit his name on regular payrolls; (c) §§ 10-109b and 10-110 of the General Statutes provide the trustees with the authority to make rules governing faculty service and (d) the rules established by the trustees require advance notice of resignation.

It is a well-settled principle of statutory construction that a statute will not be construed so as to alter the common law unless such a legislative intention is fairly expressed by the words employed. *Shaw v. Railroad Co.*, 101 U.S. 557, 565, 25 L. Ed. 892; *Dennis v. Shaw*, 137 Conn. 450, 452, 78 A.2d 691; 2A Sutherland, Statutory Construction (4th Ed.) § 50.05. The statutory provisions cited by the plaintiff, providing the board of trustees with the ultimate authority over teacher termination and resignation cannot be said to indicate a legislative intent to alter the common-law doctrine of implied resignation as applicable to the plaintiff.

## IV

The plaintiff also claims that the dual-job ban provision as applied to him is constitutionally invalid. Since we have concluded that the statutory prohibition of § 2-5 of the General Statutes is inapplicable to the plaintiff under the circumstances of this case, we confine our consideration to the constitutionality of article third, § 11, of our state constitution.[6]

---

[6] "[T]he protection of the Federal Constitution applies, whatever the form in which the legislative power of the State is exerted; that is, whether it be by a constitution, an act of the legislature, or an act of any subordinate instrumentality of the State exercising delegated legislative authority." *Standard Computing Scale Co.* v. *Farrell*, 249 U.S. 571, 577, 39 S. Ct. 380, 63 L. Ed. 780.

It is the plaintiff's position that our state constitutional prohibition is invalid under the equal protection clause of the federal constitution. If the provision is found to impinge upon a fundamental right or create a suspect classification, it must be struck down unless justified by a compelling state interest. *Dunn* v. *Blumstein*, 405 U.S. 330, 335, 92 S. Ct. 995, 31 L. Ed. 2d 274. If, however, no fundamental rights or suspect classifications are involved, the prohibition will withstand constitutional attack provided the distinction is founded on a rational basis. *McGinnis* v. *Royster*, 410 U.S. 263, 270, 93 S. Ct. 1055, 35 L. Ed. 2d 282.

There is no express constitutional provision guaranteeing any individual the right to become a candidate for public office. The state can constitutionally place conditions on the right to candidacy so long as those constraints do not violate constitutional principles of general applicability. See, e.g., *Storer* v. *Brown*, 415 U.S. 724, 728, 94 S. Ct. 1274, 39 L. Ed. 2d 714. Neither the first nor the fourteenth amendment automatically interdicts all restrictions on the ability to become a candidate. See *American Party of Texas* v. *White*, 415 U.S. 767, 780–85, 94 S. Ct. 1296, 39 L. Ed. 2d 744.

The plaintiff argues that the dual-job ban illegally burdens a specific class of persons in seeking or holding public office, and that such restriction impermissibly impinges upon the first amendment rights of one running for or holding state office. If we assume, without deciding, that the plaintiff has a right to serve in the General Assembly which is an extension of his rights of political association and expression, that right would of course be protected by the first amendment. *Galer* v. *Board of Regents*

*of the University System,* 239 Ga. 268, 270, 236 S.E.2d 617; cf. *Elrod* v. *Burns,* 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547. Although the United States Supreme Court has made it clear that government employees may be subject to restrictions on the exercise of those rights beyond that permissible if applied to private citizens; *Broadrick* v. *Oklahoma,* 413 U.S. 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830; *United States Civil Service Commission* v. *National Assn. of Letter Carriers,* 413 U.S. 548, 93 S. Ct. 2880, 37 L. Ed. 2d 796; *United Public Workers* v. *Mitchell,* 330 U.S. 75, 67 S. Ct. 556, 91 L. Ed. 754; as we have said, such a restriction which impinges upon a fundamental right can be justified only by a compelling state interest. *American Party of Texas* v. *White,* supra, 780.

The state's interest in enforcing the separation of powers provision of article second of our constitution is, by itself, such a compelling and significant governmental interest. "The need for and purpose of . . . [the dual-job ban provision] manifestly was to protect against conflicts of interest, self-aggrandizement, concentration of power, and the blurring and the obliteration of the doctrine of separation of powers, in the performance by the agents of the people of their delegated authorities to exercise the executive, legislative and judicial functions of the organized government." *Board of Supervisors of Elections* v. *Attorney General,* 246 Md. 417, 428, 229 A.2d 388. Moreover, the restriction imposed on state employees is not aimed at particular political parties, groups or points of view; it does not discriminate against racial, ethnic or religious minorities; and it does not seek to control political association or expression or attempt to interfere with anyone's vote at the polls. See

*United States Civil Service Commission* v. *National Assn. of Letter Carriers,* supra, 564. Rather, the prohibition of article third, § 11, applies to all persons holding an appointive position or office in the judicial or executive department of state government, and only curtails the right of such persons to continue to hold that employment while serving in the state legislature, not the right to campaign for and be elected to public office. In view of the significant and compelling public interest in maintaining a separation among the departments of our government and avoiding even the appearance of impropriety by state employees; see *United States Civil Service Commission* v. *National Assn. of Letter Carriers,* supra, 565; article third, § 11, of our state constitution does not violate either the equal protection guarantees or the first amendment of the federal constitution.

The plaintiff likewise challenges the constitutionality of the state's dual-job ban on the ground that it is both void for vagueness and fatally overbroad.

"Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly . . . [since] [i]t is a basic principle of due process that a statute is void for vagueness if its prohibitions are not clearly defined. See *Lanzetta* v. *New Jersey,* 306 U.S. 451, 59 S. Ct. 618, 83 L. Ed. 888; see generally, note, 'The Void-For-Vagueness Doctrine in the Supreme Court,' 109 U. Pa. L. Rev. 67." *Mitchell* v. *King,* 169 Conn. 140, 143, 363 A.2d 68.

Article third, § 11, of our state constitution specifically prohibits a member of the General Assembly from holding or accepting "any appointive position or office in the judicial or executive department

of the state government." While the plaintiff contends that the use of the words "judicial or executive department" is so imprecise as to render the provision unconstitutional, we recognize that "there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the . . . [prohibition] may not satisfy those intent on finding fault at any cost, . . . [it] is set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *United States Civil Service Commission* v. *National Assn. of Letter Carriers,* supra, 578–79. Since the general prohibition—that is, employment in more than one department of government—is plain in its direction, "the . . . [provision] will not be struck down as vague, even though marginal cases could be put where doubts might arise." *United States* v. *Harriss,* 347 U.S. 612, 618, 74 S. Ct. 808, 98 L. Ed. 989.

We similarly reject the plaintiff's assertion that the dual-job ban contained in our state constitution is impermissibly overbroad. To succeed in such a claim it must be shown that the reach of the language, no matter how precise, prohibits conduct protected by the federal constitution. *Mitchell* v. *King,* supra; see *Zwickler* v. *Koota,* 389 U.S. 241, 249–50, 88 S. Ct. 391, 19 L. Ed. 2d 444; see, generally, note, "The First Amendment Overbreadth Doctrine," 83 Harv. L. Rev. 844. Assuming, arguendo, that the plaintiff is correct in his contention that he has a first amendment right to hold office, as we have pointed out, it is clear that state employees may legitimately be subject to restrictions on those rights to participate in political activities beyond that permissible in the case of private citizens.

*Broadrick* v. *Oklahoma,* supra; *United States Civil Service Commission* v. *National Assn. of Letter Carriers,* supra; *United Public Workers* v. *Mitchell,* supra.

Moreover, while we recognize the need to view restrictions upon constitutionally protected activity "in the light of less drastic means for achieving the same basic purpose"; *Shelton* v. *Tucker,* 364 U.S. 479, 488, 81 S. Ct. 247, 5 L. Ed. 2d 231; where, as here, the clear purpose of the prohibition is to avoid even the appearance of impropriety; see *United States Civil Service Commission* v. *National Assn. of Letter Carriers,* supra, 565; a claim of overbreadth cannot be sustained.[7]

## V

It is well settled that in an action for mandamus, the aggrieved party must affirmatively establish that he was deprived of a "clear legal right." *Light* v. *Board of Education,* 170 Conn. 35, 37–39, 364 A.2d 229; *Simmons* v. *Budds,* 165 Conn. 507, 516, 338 A.2d 479. As noted above, under the facts of the present case, the plaintiff was in violation of the constitutional dual-job ban and thus impliedly relinquished his teaching position when he commenced his term of office in the General Assembly in 1971. Hence, it cannot be said that the plaintiff can, at this point, claim such a "clear legal right" to his faculty salary. Moreover, a public officer cannot be compelled to perform an act which is unlawful, contrary to or forbidden by law, or which would aid in an unlawful transaction. See *Laycock* v.

---

[7] Nor can it be seriously argued that the dual-job restriction challenged in the present case is fatally overbroad when applied to teachers because of its "stifling effect on the academic mind." See *Keyishian* v. *Board of Regents,* 385 U.S. 589, 607, 87 S. Ct. 675, 17 L. Ed. 2d 629.

*Hidalgo County Water Control & Improvement District No. 12,* 142 F.2d 789 (5th Cir.), cert. denied, 323 U.S. 731, 65 S. Ct. 68, 89 L. Ed. 587; 52 Am. Jur. 2d, Mandamus, § 87. Where, as here, a valid law requires a state officer to act, he may refuse to act if to do so would violate a constitutional provision; *Rhea* v. *Newman,* 153 Ky. 604, 607, 156 S.W. 154; since he would be derelict in the performance of his duties if he were an instrumental agent or participant in the unlawful expenditure of public funds.[8] *Weza* v. *Auditor General,* 297 Mich. 686, 690, 298 N.W. 368.

Mandamus is generally viewed as a remedy at law. *United States ex rel. Greathouse* v. *Dern,* 289 U.S. 352, 53 S. Ct. 614, 77 L. Ed. 1250. By stating our conclusion regarding the application of that remedy under the unique facts of this case, however, we express no opinion as to the availability of other remedies the plaintiff may pursue.

## VI

The questions reserved for our advice as set forth in footnote one are answered as follows:

To questions 1 (e), 3 and 8 we answer in the affirmative.

To questions 1 (a), 1 (c) and 4 we answer in the negative.

To questions 5, 6, and 7 we answer in the negative insofar as they relate to article third, § 11, of the state constitution.

---

[8] We call attention to the fact that the defendant comptroller in the present case withheld payment of the plaintiff's salary only after receiving a legal opinion from the attorney general regarding the propriety of pursuing such a course of action.

Questions 1 (b), 1 (d), 1 (f), 2 (a), and 2 (b) require no answers.

No costs will be taxed to any party.

In this opinion the other judges concurred.