## ROBERT R. DAVENPORT *v.* THE SOCIETY OF THE CINCINNATI IN THE STATE OF CONNECTICUT*

Superior Court      Judicial District of Hartford      File No. CV990588217S

Memorandum filed November 10, 1999

*Jonathan J. Klein,* for the plaintiff.

*Tyler, Cooper & Alcorn,* for the defendant.

* An appeal to the Appellate Court by the plaintiff was filed on November 29, 1999; Appellate Court Docket No. AC 20274. On February 9, 2000, the appeal was disposed of on party motion.

## I

## INTRODUCTION

LAVINE, J. In May, 1783, officers of the Continental Army, having risked their lives, fortunes and honor to win independence for the American colonies, resolved to form a hereditary society to perpetuate "the mutual friendships which have been formed under the pressure of common danger." They prevailed upon George Washington, who had served as commander of the army, and who had not yet assumed his place as first president of the United States, to become the first president general of the new organization. They decided to name it The Society of the Cincinnati,[1] creating a General Society which was to be divided into thirteen State Societies.[2] They adopted a founding document—The Institution—which set out its structure and the principles upon which the society was based.[3]

The Institution stated that: "The following principles shall be immutable and form the basis of the Society of the Cincinnati:

---

[1] The facts as recited are taken from the June 29, 1999 stipulation of facts jointly submitted by the parties. That stipulation of facts is attached to this memorandum of decision as appendix 1.

According to an entry in the Encyclopedia Britannica (Vol. 3, 15th Ed.) p. 323, tradition holds that in 458 B.C. Lucius Quinctius Cincinnatus was working on his small farm when he was informed that he was being appointed dictator of Rome in order to rescue a consular army surrounded by the Aequi, a rival Italic tribe. He is said to have defeated the enemy in a single day, celebrated a triumph in Rome, and then relinquished his authority as soon as Rome had been brought through the emergency. He became a model of selfless devotion to service and republican idealism.

The Society of the Cincinnati in the state of Connecticut is a tax exempt charitable organization and a Connecticut nonstock corporation specially chartered by Special Acts 1895, No. 121, § 1, of the General Assembly, as amended by Special Acts 1984, No. 84-14, § 4.

[2] A French Society was later added.

[3] A copy of The Institution is attached to this memorandum of decision as appendix 2. The Rule of 1854 of the General Society provided, among other things, that the membership be limited to male descendants of original members.

"AN INCESSANT ATTENTION TO PRESERVE INVI-OLATE THOSE EXALTED RIGHTS AND LIBERTIES OF HUMAN NATURE, FOR WHICH THEY HAVE FOUGHT AND BLED, AND WITHOUT WHICH THE HIGH RANK OF A RATIONAL BEING IS A CURSE INSTEAD OF A BLESSING.

"AN UNALTERABLE DETERMINATION TO PRO-MOTE AND CHERISH, BETWEEN THE RESPECTIVE STATES, THAT UNION AND NATIONAL HONOR SO ESSENTIALLY NECESSARY TO THEIR HAPPINESS, AND THE FUTURE DIGNITY OF THE AMERICAN EMPIRE.

"TO RENDER PERMANENT THE CORDIAL AFFECTION SUBSISTING AMONG THE OFFICERS. THIS SPIRIT WILL DICTATE BROTHERLY KINDNESS IN ALL THINGS, AND PARTICULARLY, EXTEND TO THE MOST SUBSTANTIAL ACTS OF BENEFICENCE, ACCORDING TO THE ABILITY OF THE SOCIETY, TOWARDS THOSE OFFICERS AND THEIR FAMILIES, WHO UNFORTUNATELY MAY BE UNDER THE NECESSITY OF RECEIVING IT." (Internal quotation marks omitted.)

The Institution, anticipating the unhappy probability that on occasion members might be subject to expulsion, included the following clause: "The State Society will regulate everything respecting itself and the Societies of its districts consistent with the general maxims of the Cincinnati, judge of the qualifications of the members who may be proposed, *and expel any member who, by a conduct inconsistent with a gentleman and a man of honor, or by an opposition to the interest of the community in general, or the Society in particular, may render himself unworthy to continue a member.*"[4] (Emphasis added; internal quotation marks omitted.)

---

[4] Article 25 of the bylaws of the Society of the Cincinnati in the State of Connecticut, relates to expulsion. It tracks the language of the grounds provided for in the 1783 Institution, providing as follows: *"Expulsions.* The society by a two-thirds vote of those present at any meeting may expel any

In the present case, the plaintiff, Robert R. Davenport, a member in good standing of the defendant, The Society of the Cincinnati in the State of Connecticut, from 1977 until February 15, 1999, having joined in the right of his ancestor, Lieutenant Hezekiah Davenport, challenges his expulsion from the defendant. Davenport seeks a mandatory injunction, requiring the defendant to reinstate his membership. The defendant opposes the application. The legal and factual issues have been fully and thoughtfully briefed. Lengthy oral argument was held on September 8, 1999. Counsel are commended for the high quality of their written and oral advocacy. Following argument, the parties agreed that the hearing on the application for temporary injunction could be considered as a hearing on the motion for permanent injunction as well.

For the reasons stated, Davenport's application is denied.

## II

## RELEVANT FACTS

The facts relevant to this decision are as follows. An extended discussion of the facts including various pertinent correspondence, is required to put this decision in context.

By letter dated September 17, 1992, Davenport wrote to Philippus Miller V, secretary general of the Society of the Cincinnati. The letter, written on Davenport's stationery with a Los Angeles return address of 546 Midvale, Suite 8, Davenport's correct address, stated in pertinent part as follows:

"Dr. Mr. Miller:

member *who, by conduct inconsistent with a gentleman and a man of honor, may render himself unworthy to continue as a member provided the notice of such meeting contains notice of the action proposed to be taken."* (Emphasis added.)

"I am a member of the Society of the Cincinnati in the State of Connecticut, and also the President of the Southern California Chapter of the California Association of the Society of the Cincinnati.

"A number of members here in Southern California have mentioned that it would be a good idea to reprint the 1938 book, *Original Members and Other Officers Eligible to the Society of the Cincinnati*, by Bryce Metcalf. Copies are virtually impossible to obtain, and then they are in very bad condition, and at very high cost.

"I would be willing to reprint this book, but first I wanted to ascertain that the General Society would have no objections. While the copyright has expired, I feel it is very important to have the approval of the General Society in order to continue on the project. I would of course do a first class job, and I would also ensure that copies would be available for purchase to all members, probably through a short announcement in *Cincinnati Fourteen*.

"Please let me know if this would be acceptable to the General Society.

"Your assistance in this matter is greatly appreciated.

"Sincerely,

"Robert Davenport"

In response, by letter dated September 25, 1992, Miller wrote back to Davenport at 546 Midvale, Suite 8, on stationery of the Society of the Cincinnati, from its Washington, D.C. headquarters, as follows:

"Dear Mr. Davenport:

"Thank you for your letter of September 17th requesting permission to reprint Bryce Metcalf's book, *Original Members and Other Officers Eligible to the Society of the Cincinnati.*

"Over the past few several years several other members of the Society have also sought approval to reprint the book. *However, because of the numerous errors and inconsistencies, the Standing Committee voted that the book not be reprinted.*

"However, thank you for taking the time to write, and please do not hesitate to contact me if you have any further questions.

"Sincerely,

"Philippus Miller, V
"Secretary General" (Emphasis added.)

There the matter rested for approximately one and one-half years.

On March 8, 1994, society president general Frederick L. Graham sent a letter to Davenport again addressing the subject of the Metcalf book. This letter was addressed not to 546 Midvale, Suite 8, but was mistakenly addressed to 654 Midvale, Suite 8. It stated:

"Mr. Robert R. Davenport
654 Midvale, Suite 8
Los Angeles, California 90024-2307

"Dear Mr. Davenport,

"It has been brought to the attention of the General Society of the Cincinnati that you have plans to reprint Bryce Metcalf's *Original Members and Other Officers Eligible to the Society of the Cincinnati.*

"The Society is also aware of your letter of September 17, 1992 to Secretary General Philippus Miller, V in which you expressed a desire to reprint this work but only if '. . . The General Society would have no objections . . .' because you '. . . feel it is very important to have the approval of the General Society . . .' . In

this regard, the Society also noted the Secretary General's reply of September 25, 1992 in which he advised you that:

" 'Over the past few . . . years several other members of the Society have also sought approval to reprint the book. However, because of the numerous errors and inconsistencies the Standing Committee voted that the book not be reprinted.'

"The Secretary General sent a second letter to you on November 20, 1992 stating again that Metcalf's book would not be reprinted but that '. . . we will keep your name on file with those of other Society members who have offered to do the same.'

"Mr. Davenport, the Society of the Cincinnati is unable to comprehend your position in this matter. I repeat that it has been, and is, the position of the General Society that this work *not* be reprinted. Your sensational advertisement that Bryce Metcalf '. . . documented every other officer of the Continental Army and Navy who was eligible for admission to membership in the society . . .' is simply not true and is misleading. He listed many who are not eligible and missed many who are. This is precisely why the Society does not wish Metcalf reprinted.

"The Society of the Cincinnati again asks that you *not* reprint Metcalf or, if you have already done so, that the book not be sold or otherwise distributed in any way . . . .

"As a member of our 'One Society of Friends' I am certain that you will abide by the decision of the General Society of the Cincinnati in these matters as you have said you wished to do. . . ."

More than one year and eight months later, by letter dated November 20, 1995, Peter W. North, president of

the defendant, sent another correspondence to Davenport. This letter read:

"Dear Mr. Davenport,

"It has been brought to the attention of the Connecticut Society that you recently had reprinted *Original Members and Other Officers Eligible to the Society of the Cincinnati* by Bryce Metcalf.

"Your letter of September 17, 1992 to the General Society indicated a willingness to reprint Metcalf's book, but you felt it would be inappropriate to do so without the approval of the General Society. Subsequently in letters of September 25, and November 20, 1992 the Secretary General indicated that it would not be appropriate to reprint Metcalf's book and gave you reasons for this decision. On November 9, 1993 your father was given special permission to speak at a Connecticut Society Standing Committee Meeting to plead your case for the reprinting of Metcalf's book. You were subsequently informed that the Connecticut Society would defer any approval to the General Society. Finally, the President General sent you a very detailed letter on March 8, 1994 asking that you not reprint Metcalf's book, and again various reasons for not doing so were given. It has been said that your actions were not as a member of our 'One Society of Friends.'

"The Standing Committee of the Connecticut Society plans to discuss your actions at its next meeting which will probably be no later than February 1996, and at that time appropriate action will be decided on. I thought I would give you an opportunity to explain your actions prior to that meeting. . . ."

By letter dated May 30, 1996, Davenport wrote to Warren M. Little, chairman of the history committee of the Massachusetts Society of the Cincinnati.

This letter stated in pertinent part as follows:

"Dear Mr. Little:

"I read with great interest in the latest issue of *Cincinnati Fourteen* that your History Committee is considering publishing a corrected version of Metcalf's *Original Members and Other Officers Eligible to the Society of the Cincinnati.*

*"I believe that is an excellent idea. I tried this several years ago, but at that time the Society was not interested in a corrected version, and as a result I had to reprint the original book without any corrections.*

"I would be interested in obtaining a copy of your 'errata sheet' when you have completed documenting the errors in the original Metcalf. It would be my pleasure to reproduce that sheet, at my own expense, and I will insert it in each copy of Metcalf.

"In addition, such an errata sheet would be of great value to those persons who own an original copy of Metcalf (not my reprint). This would allow them, without purchasing a new book, to have a corrected copy of Metcalf.

"Your assistance in this matter is greatly appreciated, and I look forward to your reply. . . ." (Emphasis added.)

The record also reveals that Davenport received correspondence dated September 27, 1996, from the public services librarian at the General Society's Washington, D.C. Anderson House headquarters thanking him for having made a gift of the 1995 reprint of the Metcalf book.

By letter dated October 28, 1996, Little, writing on behalf of the Massachusetts Society's history committee, wrote to Davenport as follows:

"Dear Mr. Davenport:

"Thank you for your letter of July 12, 1996 outlining two proposals for the Society's consideration to dispose of the remaining copies of Metcalf's book which you had reprinted without the permission of the Connecticut or General Society.

"The History Committee reviewed the proposals at its meeting on October 25th in Washington and voted to recommend that the Society take no action on either proposal or consider any further action on the subject. The Standing Committee of the General Society at its meeting on October 26th concurred with this recommendation. . . ."

There matters stood until 1998. By correspondence in November and December, 1998, Davenport was informed that his use of Anderson House continued to be suspended, as it had been over the past year. According to the president general's December 2, 1998 letter to Davenport, Davenport's "use of Anderson House was suspended indefinitely because of ungentlemanly conduct in your relationship with several members of the House Staff."

In late 1998, the dispute escalated to a new phase when Davenport was informed by a letter dated December 23, 1998, that a three member committee—composed of David W. Dumas, chair, Atwood Collins II and Jay W. Jackson—had been appointed to review reports of Davenport's conduct that appeared to be inconsistent with further membership in the society. The letter stated that the committee sought Davenport's response to five allegations before making a recommendation on whether to call for a vote of expulsion pursuant to article 25 of the bylaws. The letter requested Davenport's sworn, written comments as to the accuracy of each of the allegations. Each of the five allegations was then set out in a single sentence. Subsequently, the

defendant proceeded on only two of the allegations, numbers four and five, which alleged as follows:

"4. That you caused to be reprinted Bryce Metcalf's *Original Members and Other Officers Eligible to the Society of the Cincinnati, 1783–1938*, including the copyrighted insignia and name of the Society, without authorization from the Society and indeed over its objections.

"5. That you were asked to leave Anderson House by then Vice President General Raiford in April 1997 by reason of your treatment of several members of the staff, and that your use of Anderson House was and remains suspended."[5]

An exchange of correspondence ensued.

By letter dated January 13, 1999, Attorney Jonathan J. Klein, Davenport's counsel, responded to the allegations. Attached to the letter was a sworn affidavit from Davenport denying and addressing the charges.

As to allegation number four, relating to the Metcalf book, Davenport asserted in his affidavit that it was "moot." The affidavit stated that: "This allegation was made a number of years ago by the Connecticut Society to the General Society. At my insistence, it was voted on by both the History Committee and the Standing Committee, and both I and the Connecticut Society were advised that the Society would not consider any further action on the subject."

By letter dated January 14, 1999, the Dumas Committee reported to David Franklin Musto, president of the

---

[5] The record and briefs discuss the Anderson House allegations at great length. Because the court concludes that the allegation relating to the reprinting of the Metcalf book provides a separate, independent and reasonable basis for the expulsion, the more problematical Anderson House issue is not discussed in this memorandum of decision.

Connecticut Society of the Cincinnati. With respect to allegations number four and five, the committee stated that it believed the allegations to be "well founded." The committee concluded that: "As to the fourth, having to do with the unauthorized printing of Metcalf's work, Mr. Davenport offers in his defense only an acknowledgment from Mrs. Ellen Clark of the Anderson House Library, in gracious terms, for a gift of a copy of his reprint, which is no more than one would expect, and a letter from the History Committee declining several of Mr. Davenport's proposals made after the fact. Leaving aside the legal matter of copyright infringement as to the name and insignia, there is no doubt in our minds that Mr. Davenport proceeded with his project after being asked on a number of occasions not to do so."

The committee concluded that Davenport's conduct as set out in allegations number four and five was "inconsistent with that of a gentleman and a man of honor, and not consistent with membership in 'One Society of Friends.' "

By letter dated January 15, 1999, Musto communicated the committee's conclusion to Davenport and further informed him that a special meeting to address Davenport's expulsion would be held at 9 a.m. on Monday, February 15, 1999, at the Quinnipiack Club, 221 Church Street in New Haven. Klein then wrote to Musto, by letter dated January 19, 1999, seeking copies of all documents upon which the committee had relied in reaching its conclusion as well as the defendant's bylaws. By letter dated January 22, 1999, Dumas replied to Klein's January 19, 1999 letter, outlining what documents would be made available to the members on February 15, and offering to supply Klein with any documents his client had not provided him. The bylaws were also enclosed. A notice dated January 25, 1999, was sent out, informing the mem-

bership that a special meeting would be held for the purpose of considering and acting upon the committee's report, in light of article 25 of the bylaws.

Klein, in a letter dated January 27, 1999, requested certain information from Dumas. Moreover, in light of the fact that the defendant had decided not to seek Davenport's expulsion based on the first three allegations, he requested that, to avoid undue prejudice to his client, all portions of the committee's report relating to these allegations—and Davenport's responses to them—be redacted from documents to be presented to the members. In a February 5, 1999 response, Dumas agreed to Klein's request that references to the first three charges be redacted. Dumas also informed Klein that fifteen minutes would be allotted for the committee's report; followed by twenty minutes for Davenport's reply; followed by five minutes for the committee to make any follow-up comments. Klein was also informed that he could accompany Davenport to the meeting, if Davenport chose to attend, but that it was expected that Davenport would make his own presentation.

By correspondence dated February 8, 1999, Klein responded to Dumas' last letter. In this letter, Klein stated as follows: "With respect [to] one of the documents which you provided to me, specifically, the March 8, 1994 letter from then President General Graham to Mr. Davenport regarding the Metcalf book, you should be aware that Mr. Davenport never received it. The letter was misaddressed and, as the letter from the United States Postal Service in Los Angeles (copy enclosed) attests, one can see how the seemingly minor error in the address could have resulted in the letter not being delivered to Mr. Davenport, as the wrong address is on a different delivery route. The misaddressing of the letter is most unfortunate, as had it been

received by Mr. Davenport, the entire course of events might have changed."

On February 15, 1999, the special meeting was held at the Quinnipiack Club. In attendance were members of the defendant, Davenport and Klein.

The meeting began at 9:03 a.m., according to the initial and corrected copies of the transcript. Following a blessing and a determination that a quorum was present, Davenport and Klein were reminded of the applicable ground rules.

Dumas noted, among other things, that he did not propose "to get into the question as to whether or not the republication of Metcalf was or was not a good thing" because reasonable people could differ on that. The gist of the committee's recommendation, he continued, was regardless of whether one viewed the republication as a good thing, Davenport was informed on a number of occasions by both the defendant and the General Society that, "for whatever reasons it chose," the Metcalf book was not to be republished. Nonetheless, continued Dumas, Davenport persisted in having the book republished. The issue was not one of legalities, but rather "[i]t is whether or not it was consistent with his obligation as a member of One Society of Friends."

Dumas noted that Davenport contended that he did not receive the comprehensive and emphatic statement from the president general contained in the letter dated March 8, 1994. "It is the feeling of those who sent the letter that he did . . . . I think it will come down as is often the case to which version you choose to believe." Notwithstanding Davenport's claim that he had not received the March 8, 1994 letter, Dumas concluded that "it is fair to say looking at the files as a whole that it had been made clear to Mr. Davenport by a number of people on a number of occasions what the wishes

of the society were in this regard. And whether or not that particular letter was received does not necessarily undermine the recommendation of the committee."

Davenport was given an opportunity to speak. After referring to letters of support provided by supporters, including his father— also a member of the defendant— he read a six page statement dated February 10, 1999, into the record. In that statement, Davenport denied all of the allegations against him.

The statement alleged, among other things, that Davenport was being victimized by false charges by persons including "drug dealers, and persons who have [been] accused of everything from embezzlement to grand larceny. Members of their gang have even been sent to prison as the result of conviction of felonies. Are these the types of members you want in the Society of the Cincinnati?" Davenport stated that the defendant would be better served if it investigated the persons making false charges against him, rather than him. Davenport described himself as the target of "nefarious individuals, who unfortunately have infiltrated the hereditary society community" and who had engaged in a five year history of persecution and a "campaign of terrorism" against him.

With specific reference to the Metcalf book allegation, Davenport stated as follows: "As regards the Metcalf book, it is well known that many persons within the society have wanted this republished, including the history committee of the General Society. This reprinting was a service to the society, and which has still not recouped its cost, being several thousand dollars in the red. A letter from the President General, asking me not to republish it, was sent to the wrong address, and I never received it. In fact, the address was not even on my [carrier's] mail route. This all occurred six or seven years ago. Four years ago, the

Standing Committee of the General Society considered this matter, and now consider it closed. As I understand from a letter of Mr. Peter North, the Connecticut Society itself considered this matter at a Standing Committee meeting three years ago. One would expect that some sort of self-imposed statute of limitations would attach to such matters, to prevent this remaining a topic of consideration well into the next millennium."

When he ran over his allotted time, Davenport was permitted to read into the record letters from supporters. Although he had been informed he would not be allowed to speak, Klein was given the opportunity to read into the record a brief statement. With respect to the Metcalf book, Klein stated: "Regarding Mr. Davenport's reprinting of the Metcalf book four years ago, while the evidence shows that the Society did not want it done, the single letter conveying this feeling unambiguously was misaddressed and never received by Mr. Davenport. Had he received the letter, we would not be talking about this today. Of the greatest importance to you should be the fact that the History Committee and the Standing Committee of the General Society decided to take no action on the subject in October 1996 and the President of the Connecticut Society, Mr. North, was so informed. That should have been the end of the matter as, after all, this is General Society business, not Connecticut Society business. The General Society reacted to Mr. Davenport's gift of a volume of the reprinted book with thanks rather than accusations and outrage."

Klein went on to make reference to "a mean-spirited personal vendetta against Mr. Davenport by certain individuals," and argued that "it is manifestly unreasonable after all this time to use this as a pretext for expulsion."

Following brief responsive remarks by Dumas, members posed questions to Davenport. With respect to the

Metcalf book, the following questions and responses were given:

"Mr. Townshend: I would like to ask Mr. Davenport if he was totally unaware that there was opposition to the publication of the book.

"Mr. Davenport: The letter from the President General that was sent to me, and was the first thing that was sent to me after my discussions with Mr. Putnam, was misaddressed. I never received it.

"Mr. Townshend: That's not my question. My question is: Were you aware that there was opposition that you obviously had ongoing discussions about the publication of the book?

"Mr. Davenport: Right. There [were] extensive conversations about the publication of the book. And my perception of that was that the Society did—let me see how I can phrase this so it's clear to everybody. I approached the Society about doing a corrected version of the book. It became clear to me that the Society was not interested in correcting the book. And then my subsequent conversation with Mr. Putnam—and I have—I have a copy of the letter I sent to him, confirming that was that. Since they didn't want to do a corrected version, the logical thing was to reprint it exactly the way it was because that book is on microfilm.

"You know, it's something I think that the Connecticut Society should be proud of. Bryce Metcalf is one of the few Connecticut Generals to come out of the Society. I thought this was good in the Society and not something—

"Mr. Dumas: Just be responsive to the question.

"Mr. Davenport: Well, the response was what became clear to me was they did not want to help with a corrected version. And therefore, that's why I sent the letter to Mr. Putnam that we should just reprint it as is."

Following more questions and responses, consistent with Robert's Rules of Order, Davenport was given the opportunity to vote. Davenport was then instructed to leave the room. The members voted. The result was seventeen votes to expel, and one vote not to expel.

By letter dated February 16, 1999, a copy of which was forwarded to Klein, the defendant informed the General Society that as of February 15, 1999, Davenport was no longer a member of the defendant. The record reflects no indication that any other member has ever been expelled from the defendant.

## III

## LEGAL DISCUSSION

### A

### Standards Relating to Issuance of Injunctive Relief

A party seeking injunctive relief must ordinarily demonstrate that it is reasonably probable that he or she will be successful on the merits; that there is no adequate remedy at law; that he or she will be irreparably harmed if relief is not granted; and that the balance of equities favors the relief requested. *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 196 Conn. 451, 457–58, 493 A.2d 229 (1985). Where, as here, a party seeks a mandatory injunction, "a court order commanding a party to perform an act"; *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 652, 646 A.2d 133 (1994); the plaintiff's burden is greater. Where a mandatory injunction is sought, the moving party must show "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from denial of the injunction. (Internal quotation marks omitted.) *Phillip* v. *Fairfield University*, 118 F.3d 131, 133 (2d Cir. 1997). A mandatory injunction is "an extraordinary remedy granted in the sound discretion of the court

and only under compelling circumstances." *Simmons* v. *Budds*, 165 Conn. 507, 515, 338 A.2d 479 (1973), cert. denied, 416 U.S. 940, 94 S. Ct. 1943, 40 L. Ed. 2d 291 (1974).

## B

### Freedom of Association as it Relates to Private Organizations

Any discussion of applicable legal principles must begin with recognition of the fact that the freedom of persons to associate with others sharing common goals, beliefs and interests is of a constitutional dimension.[6]

---

[6] Given the historical framework of the present case, it is also appropriate to note that Americans have always had a particular affinity for banding together in groups, associations, societies, clubs and other sorts of political and fraternal organizations. This tendency was noted in the early years of the American Republic by Alexis deTocqueville in *Democracy in America.* As deTocqueville stated: "In no country in the world has the principle of association been more successfully used, or applied to a greater multitude of objects, than in America. Besides the permanent associations, which are established by law, under the names of townships, cities, and counties, a vast number of others are formed and maintained by the agency of private individuals." 1 A. deTocqueville, Democracy in America (1898 Ed.) p. 242.

"Societies are formed to resist evils which are exclusively of a moral nature, as to diminish the vice of intemperance. In the United States, associations are established to promote the public safety, commerce, industry, morality, and religion. There is no end which the human will despairs of attaining through the combined power of individuals united into a society." Id., p. 243.

"There are no countries in which associations are more needed, to prevent the despotism of faction or the arbitrary power of a prince, than those which are democratically constituted. In aristocratic nations, the body of the nobles and the wealthy are in themselves natural associations, which check the abuses of power. In countries where such associations do not exist, if private individuals cannot create an artificial and temporary substitute for them, I can see no permanent protection against the most galling tyranny; and a great people may be oppressed with impunity by a small faction, or by a single individual." Id., p. 247.

"The most natural privilege of man, next to the right of acting for himself, is that of combining his exertions with those of his fellow-creatures, and of acting in common with them. The right of association therefore appears to me almost as inalienable in its nature as the right of personal liberty." Id., p. 248.

*Roberts* v. *United States Jaycees*, 468 U.S. 609, 622, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984) ("we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends"); see also Conn. Const., art. I, §§ 4 and 14. Impediments to the exercise of one's right to choose one's associates "can violate the right of association protected by the First and Fourteenth Amendments." *Hishon* v. *King & Spalding*, 467 U.S. 69, 80 n.4, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). As the United States Supreme Court stated in *Roberts:* "There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate." *Roberts* v. *United States Jaycees*, supra, 623.

As the defendant notes, the United States Supreme Court has made reference to two senses in which it recognizes freedom of association. That court has held "that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships." *Board of Directors of Rotary International* v. *Rotary Club*, 481 U.S. 537, 544, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987). The Supreme Court has also upheld the freedom of individuals to associate "for the purpose of engaging in protected speech or religious activities." Id. The present case principally concerns the first type of associational freedom.

Depending on the attributes of the group or entity under consideration, and the nature of the relationships involved, varying degrees of freedom from government

interference are appropriate. *Roberts* v. *United States Jaycees*, supra, 468 U.S. 620. The family unit, for example, being among the most intimate and involving the most fundamental and private types of issues and decisions, is entitled to a very high level of autonomy. Professional organizations with commercial or business purposes are entitled to less. *Board of Directors of Rotary International* v. *Rotary Club*, supra, 481 U.S. 544–49. In cases involving some form of invidious discrimination or protected classes of persons, a substantial amount of government interference is required to protect society's strong interest in promoting equality. In the present case, there is no claim of invidious discrimination of the sort existing in other cases involving associational freedom. See, e.g., *Cross* v. *Midtown Club, Inc.*, 33 Conn. Sup. 150, 365 A.2d 1227 (1976). *Cross* is clearly distinguishable on its facts, as it involved the exclusion of women from a luncheon club.

There are relatively few recent reported Connecticut decisions addressing the issues raised in the present case.[7]

---

[7] Older cases, such as *Connelly* v. *Masonic Mutual Benefit Assn.*, 58 Conn. 552, 557, 20 A. 671 (1890), stress the long-standing reticence of courts to interfere in the internal affairs of voluntary societies or associations relating to admission, disciplining and expulsion of members. "If it is found that the proceeding was had fairly, in good faith and pursuant to its own laws, and that there was nothing in it in violation of any law of the land, then the sentence is conclusive like that of a judicial tribunal." Id.

For a comprehensive discussion of judicial decisions in this area, see *Falcone* v. *Middlesex County Medical Society*, 34 N.J. 582, 170 A.2d 791 (1961).

In reviewing the case law, it is important to keep in mind the distinction Professor Zechariah Chafee, Jr. noted between social and fraternal organizations, on the one hand, and professional societies and trade unions, on the other. Z. Chafee, Jr., "The Internal Affairs of Associations Not for Profit," 43 Harv. L. Rev. 993 (1930). As Chafee noted, exclusion or expulsion from a social or fraternal organization "may result in little more than hurt feelings"; *Falcone* v. *Middlesex County Medical Society*, supra, 34 N.J. 588; while expulsion or exclusion from a professional society, e.g., a medical or dental society or other professional society, can result in an interference with the opportunity to earn a livelihood. Z. Chafee, Jr., supra, 1022. Each case must

The leading case, upon which both sides rely, is *Sterner* v. *Saugatuck Harbor Yacht Club, Inc.*, 188 Conn. 531, 450 A.2d 369 (1982). *Sterner* was decided pursuant to General Statutes (Rev. to 1981) § 33-459, the predecessor to General Statutes § 33-1056 (a). General Statutes (Rev. to 1981) § 33-459 required, in pertinent part, that membership in nonstock corporations "shall be governed by such rules of admission, retention, withdrawal and expulsion as the bylaws shall prescribe, *provided all such bylaws shall be reasonable, germane to the purposes of the corporation and equally enforced as to all members.*" (Emphasis added.) The language of § 33-1056 (a) is fundamentally identical.[8]

In *Sterner*, the plaintiff was expelled from a yacht club when, believing himself to be blocked from access to his moored sloop, he climbed over the truck of a junior member of the club whose father was a member of the board of governors. The plaintiff was expelled as a consequence. Reversing the trial court's refusal to order the plaintiff to be reinstated, then Chief Justice Speziale noted that nonstock corporations have those powers permitted by the nonstock corporation statutes, their certificates of incorporation, and their bylaws. Where a corporation acts in excess of these powers, its acts may be enjoined by a member. *Sterner* v. *Saugatuck Harbor Yacht Club, Inc.*, supra, 188 Conn. 535. The reasonableness requirement of § 33-459, he noted, adopts common-law standards of "fair play." (Internal quotation marks omitted.) Id., 536. Membership is

be evaluated and decided on its own facts, including careful consideration of what kind of nonstock corporation is involved.

[8] The defendant argues that General Statutes § 33-1056 (a) is inapplicable to this proceeding, and that the plaintiff bears the burden of demonstrating its applicability. The defendant cites no authority for this creative argument. It is unpersuasive. In the absence of authority to the contrary, § 33-1056 (a) must be viewed as applicable to all Connecticut nonstock corporations such as the defendant, irrespective of when they were formed and notwithstanding the inconclusive language of General Statutes § 33-1001 (b).

required by statute to be governed by bylaws that are reasonable. He stated, moreover, that "[b]ylaws reasonable on their face may not be unreasonably applied." Id. The statutory requirement of reasonable bylaws "requires a hearing that is meaningful and a sanction that is reasonable . . . ." Id. Thus, the opinion rejects expulsion for an improper reason, as well as expulsion based on unfair procedures. See, e.g., *Pinsker* v. *Pacific Coast Society of Orthodontists*, 12 Cal. 3d 541, 550–52, 526 P.2d 253, 116 Cal. Rptr. 245 (1974). Chief Justice Speziale concluded that the hearing afforded the plaintiff was not meaningful and that the sanction imposed was not reasonable. *Sterner* v. *Saugatuck Harbor Yacht Club, Inc.*, supra, 537. Although Chief Justice Speziale noted that in ordinary cases courts should be reluctant to intervene in the affairs of private clubs, in *Sterner*, he concluded, reinstatement was warranted. Id. *Sterner* is factually distinguishable from the present case. In *Sterner*, a private disagreement was improperly transmuted into yacht club business.

*DeBernardo* v. *Pinewood Lake Assn., Inc.*, 46 Conn. Sup. 265, 747 A.2d 1076 (1999), is the sole case brought to the court's attention decided under § 33-1056 (a). In *DeBernardo*, the plaintiffs challenged the validity of their expulsion from a defendant lake association, which restricted use of the lake on which the plaintiffs' cottages were located to association members. Id., 266. The defendant association had adopted a bylaw barring members from living in their cottages between November 1 and April 1; however, the bylaw only applied to some lots and not to others. Id., 272, 274. The defendant association was unable to provide a reasonable explanation for the bylaw, beyond the fact that it had always been in effect. Id., 277. Judge Hodgson did not find that explanation convincing, ruling that the challenged bylaw was not germane to the accomplishment of a clearly articulated corporate purpose. Id., 279.

## C

## Arguments of the Parties, and Application of Facts to Controlling Legal Principles

### 1

### The Claim that the Bylaw Is Unreasonable on Its Face Because the Term "Conduct Inconsistent With a Gentleman and a Man of Honor" Is Undefined and Vague, and Because It Provides for No Remedy Short of Expulsion

Davenport recognizes that the constitution, rules and bylaws of an unincorporated association constitute a contract between the members and will be enforced by the courts if not contrary to public policy. 6 Am. Jur. 2d 399, Associations and Clubs § 8 (1999). Davenport argues, however, that article 25 of the defendant's bylaws is unreasonable on its face because the term "conduct inconsistent with a gentleman and a man of honor" is undefined and vague. The court does not agree.

Many words are susceptible to numerous shades of meaning depending on a wide range of factors. While the term "conduct inconsistent with a gentleman and a man of honor" sounds archaic and quaint to the modern ear, that does not mean the words are without meaning. The court agrees with the defendant's argument that many words and phrases from bygone eras— like "due process of law," "cruel and unusual punishment," and "high crimes and misdemeanors," all found in the United States constitution—change over time, while retaining a core meaning. The words "conduct inconsistent with a gentleman and a man of honor" were the words chosen by the originators of the Society of the Cincinnati in 1783 when they established their society. To render these words a nullity simply because they have not been precisely defined, as an attorney might define a term when negotiating a contract, or a

legislator might when drafting a law, would be inappropriate. The words are no more vague than general descriptive terms used everyday in courts, and in ordinary conversation—words like rich, or fair, beautiful or sad.

More specifically, the 1933 edition of the Oxford English Dictionary contains numerous definitions and uses of the word "gentleman." Its first given definition is: "A man of gentle birth, or having the same heraldic status as those of gentle birth; properly, one who is entitled to bear arms, though not ranking among the nobility . . . but also applied to a person of distinction without precise definition of rank. Now chiefly Hist." Its third definition is this: "A man in whom gentle birth is accompanied by appropriate qualities and behavior; hence, in general, a man of chivalrous instincts and fine feelings."

Likewise, the phrase "man of honor," though susceptible to different interpretations, is not unduly vague and ambiguous as used in the bylaws. The first three definitions for "honorable" in The American Heritage Dictionary of the English Language (1969) are as follows: "1. Deserving or winning honor and respect; creditable; *an honorable deed.* 2. Bestowing honor; bringing distinction or recognition; *honorable mention.* 3. Possessing and characterized by honor: *'for Brutus is an honorable man'* (Shakespeare)." (Emphasis in original.) Common synonyms include words like "honored," "revered," "esteemed" and "highly regarded." J. I. Rodale, The Synonym Finder (L. Urdang & N. LaRoche et al., eds. 1978).

Davenport's arguments based on the Uniform Code of Military Justice are not persuasive. As Davenport points out, 10 U.S.C. § 933 (1970) provides that: "Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-marital may direct." Davenport points to cases interpreting this statute and

applying it to serious misconduct, and to other cases criticizing the language as vague. See, e.g., *Parker* v. *Levy*, 417 U.S. 733, 755–56, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974), in which the United States Supreme Court upheld this section, reversing a court of appeals ruling, against a challenge on vagueness grounds. Davenport's arguments are unpersuasive fundamentally because the language of 10 U.S.C. § 933 cannot be compared to the language of a bylaw applicable to a private organization; they operate in entirely different spheres, different legal frameworks, and have different purposes. Moreover, given the military ethos which informs the defendant, the members of the society cannot be faulted for having concluded that Davenport had been insubordinate, and acted dishonorably, by ignoring the stated directive of a committee of the society and reprinting the Metcalf book. There are occasions, of course, when the refusal to conform to the will of the majority is not only not dishonorable; see, e.g., *Cross* v. *Midtown Club*, supra, 33 Conn. Sup. 150; but worthy of admiration. The present case, however, involves no great moral principle, or a stirring act of conscience being undertaken by Davenport.

Likewise, the fact that expulsion is the only penalty available does not render the bylaw unreasonable on its face. It is true that in *Sterner*, Chief Justice Speziale stated that "[t]he statutory requirement of reasonable bylaws requires a hearing that is meaningful and a sanction that is reasonable . . . ." *Sterner* v. *Saugatuck Harbor Yacht Club, Inc.*, supra, 188 Conn. 536.[9] This

---

[9] In her concurring opinion in *Sterner*, Justice Peters takes issue with Chief Justice Speziale's conclusion that the plaintiff was not offered a meaningful hearing. She also states that it is not clear to her "how an unreasonable sanction is, in and of itself, evidence of the absence of a meaningful hearing." *Sterner* v. *Saugatuck Harbor Yacht Club, Inc.*, supra, 188 Conn. 538. Justice Healey, also concurring, approvingly cites *Florida ex rel. Barfield* v. *Florida Yacht Club*, 106 So. 2d 207, 211 (Fla. App. 1958) as follows: "We agree that the courts should leave to the members of a private social club or to the proper board to which the members have lawfully delegated that power, the right to determine whether the action of a member has been such that,

court does not read this to be a blanket assertion that a bylaw *must* provide sanctions other than expulsion to avoid being viewed as unreasonable. Rather, the court understands Chief Justice Speziale's statement to indicate that a sanction must be reasonable under all circumstances present in a particular case. Clearly, Chief Justice Speziale could not have meant that the bylaws of nonstock corporations *must* have a graduated set of sanctions to withstand challenge.

2

The Claim that Article 25 of the Defendant's Bylaws Was Not Germane to the Purposes of the Society

As noted, § 33-1056 (a) provides, in pertinent part, that bylaws governing expulsion shall be "germane to the purposes of the corporation. . . ." Davenport asserts that article 25 of the bylaws was not germane to the purposes of the defendant. Davenport argues that the purposes of the corporation are strictly limited to those set forth in the special act of the Connecticut General Assembly which constituted the corporation for the purpose of carrying out the three "immutable principles" of the societies. Corporate purposes not stated will not be implied, contends Davenport, citing *Cross* v. *Midtown Club, Inc.*, supra, 33 Conn. Sup. 154–55.

The logical flaw in Davenport's argument is that it equates a *principle* actuating a nonprofit organization with a *purpose* of such an organization, resulting in an unduly narrow view of what the defendant's purpose

in the opinion of such Board, it would interfere with the pleasant, friendly and congenial social relationship between the members. *In the absence of a clear allegation and convincing proof*, if the case reaches that stage, *of fraud or bad faith, the action* of the members or duly delegated board *should not be reviewed by the courts.*" (Emphasis in original; internal quotation marks omitted.) *Sterner* v. *Saugatuck Harbor Yacht Club, Inc.*, supra, 540.

can fairly be said to be. A principle, according to the Webster's Ninth New Collegiate Dictionary, is "a comprehensive and fundamental law, doctrine or assumption." A principle is a precept. A purpose, on the other hand, according to the same dictionary, is "something set up as an object or end to be attained." Webster's Ninth New Collegiate Dictionary. Principles are not purposes. Determining the defendant's purpose or purposes, therefore, requires more than a narrowly circumscribed consideration of its three immutable principles. Notwithstanding the teaching of *Cross*, given the unique nature of the defendant, and the fact that it was established well before Connecticut's current body of corporate law and statutes was enacted, a reasonable degree of flexibility must be employed when analyzing what the defendant's "purposes" may be said to be. Unlike certain nonprofit corporations, such as an ambulance corps or a healthcare facility, this one's purpose is not to effectuate a narrow and singular goal.

Moreover, in § 3.01 of article III of the General Society's bylaws, "Purposes and Principles," the following is stated: "The purposes and principles of the Society are as set forth in the Institution of The Society of the Cincinnati adopted by the Officers of the American Army at the Cantonment of the American Army on Hudson's River on May 13, 1783."

It is thus necessary to refer to The Institution and other relevant core documents to determine the "purposes" of the society. That the purpose of the General Society—and the state societies, including the defendant—relates to and involves an ongoing evaluation of the genealogy of members and claimed members, and their suitability for membership, cannot be doubted. The societies are generally limited to males who are "lineal and collateral descendants" of officers who served in the Continental Army or Navy during the Revolutionary War. The Institution itself states that

each state society shall be the "judge of the qualifications of the members who may be proposed." Article 12 of the bylaws of the defendant establishes a committee on pretensions, which advises the standing committee with regard to the eligibility of candidates for membership. Article 12 states that: "Upon the death, resignation, retirement or expulsion of a hereditary member, the Committee on Pretensions shall review de novo the eligibility of all claimants for the line of his propositus. The Chairman of the committee shall maintain a necrology and report same at the annual meeting."

Article 21 of the defendant's bylaws states, in relevant part, that "in the case of Hereditary and Successor members the agenda must show the applicant's propositus and the specific degree of relationship of the applicant to his propositus." article 22 outlines in great detail the principles which should guide the society in evaluating membership. For example, VIII of article 22 states as follows: "The succession shall descend by primogeniture in the eldest male line so long as it continues unbroken." IX of article 22 states that: "If a line from eldest son to eldest son shall fail of male heirs, the eldest male next in relation to the last surviving son entitled to membership shall be taken and the succession shall descend by primogeniture in that line." X of article 22 states: "In case of the failure of the male line, the line which descended the greatest number of generations from the original member before a failure of males shall ordinarily be taken." XI of article 22 indicates as follows: "The claims of descendants through female lines shall be determined by the same rules of primogeniture as in the case of claims through the male line, so far as applicable." The Metcalf book itself deals with issues of genealogy.

Moreover, as the defendant argues, the defendant's members could reasonably have believed that one of

the "immutable principles" was indeed involved. The third principle states, in pertinent part: "TO RENDER PERMANENT THE CORDIAL AFFECTION SUBSISTING AMONG THE OFFICERS. THIS SPIRIT WILL DICTATE BROTHERLY KINDNESS IN ALL THINGS . . . ." The preamble to The Institution refers to the newly-formed society as "one SOCIETY OF FRIENDS." It must be recalled that The Institution provides for expulsion of a member who acts in "opposition to the interest of the community in general, or the society in particular . . . ." Like any trier of fact, the members had the right to evaluate the credibility of Davenport's explanations. The members cannot be said to have acted unreasonably in concluding that a "gentleman and a man of honor" acting consistently with "the interest of . . . the Society" would subordinate his own desires to those of the group, and abide by the group's decision, expressed in an explicit action taken by a committee of that group.

Consequently, Davenport's "germaneness" argument fails.

### 3

### The Claim that the Hearing Afforded Davenport Was Not Reasonable in a Number of Respects

Davenport asserts that the hearing afforded to him was not reasonable in a number of respects. At oral argument on September 7, 1999, Davenport focused on three specific alleged infirmities: his counsel was permitted to be present, but was told he could not speak; he was prevented from objecting to the introduction of evidence; and, he was denied the right to confront and cross-examine the witnesses against him.

In essence, Davenport's objection is that the proceedings were not more like a trial.

If the proceeding under review were a state sanctioned civil or criminal proceeding involving state action and directly implicated due process protections, Davenport's argument would be persuasive. The lack of such fundamental due process protections would render the proceeding flawed. There is no support for the proposition, however, that an expulsion procedure undertaken by a nonstock corporation must comport precisely with due process guarantees. What Davenport is entitled to, pursuant to *Sterner*, is a hearing that is "reasonable." The accused must have notice of the charges, notice of the time and place of the hearing, and a full and fair opportunity to be present and present a defense. *Gervasi* v. *Societa Giusippi Garibaldi*, 96 Conn. 50, 56–58, 112 A. 693 (1921). It is enough if the procedures adopted are "fair and make for justice rather than for form," rather than that there be precise adherence to the forms of legal procedure. Id.; see also *Connelly* v. *Masonic Mutual Benefit Assn.*, 58 Conn. 552, 557, 20 A. 671 (1890). Requiring procedures equivalent to those necessary for trials would convert expulsion hearings into full-fledged adversary proceedings interfering with a private society's fundamental right to manage its own affairs. "It is important to note that the legal duties imposed on defendant organizations arise from the common law rather than from the Constitution as such . . . the 'due process' concept is applicable only in its broadest, nonconstitutional connotation . . . we shall refrain from using 'due process' language and shall simply refer instead to a requirement of a 'fair procedure.' "[10] *Pinsker* v. *Pacific Coast Society of Orthodontists*, supra, 12 Cal. 3d 550 n.7.

---

[10] In a note entitled "Judicial Control of Actions of Private Associations," 76 Harv. L. Rev. 983, 1029–30 (1963), the following view is expressed: "Stringent procedural requirements would appear least applicable in cases involving associations which are small, loosely organized and designed to foster intimate personal or spiritual ends. Imposition here of the incidents of a trial-type hearing might actually exacerbate existing differences, while aiding little in ascertainment of the facts since administered by those unfamiliar with the operation of such formalized procedures. In such associations,

If counsel for one side is permitted to be actively involved in the hearing, then the other side may feel compelled to retain counsel as well. If formal objections are permitted, then the rules of evidence come into play. As the proceeding takes on more and more attributes of a full-blown contested adversary court proceeding, the more complex, time-consuming and costly it becomes. These costs are essential to ensure fairness in a proceeding bearing the imprimatur of the state. They are, however, counterproductive to the essential essence of most private organizations and societies.

The question facing the court, then, is whether the procedures used were fundamentally fair. The court concludes they were for the following reasons.

First, the procedural requirements of article 25 were met. The meeting was duly noticed and the notice contained notice of the action to be taken. More than two thirds of those present voted to expel. Davenport was properly notified of the charges against him, the time and place of the hearing, and was given an adequate time to prepare a defense. His counsel asked for, and was provided with all relevant documents requested relating to the Metcalf book. Information relating to the charges which were not pursued was not submitted to the members at the meeting. Davenport was permitted to submit a sworn statement prior to the hearing. He was allowed to review all of the relevant documents and attend the hearing. He was permitted to address the hearing. His counsel's involvement was severely limited, but Klein was allowed to address the meeting

moreover, the need for these devices is minimal since the members may be able to rely on their own personal knowledge in determining the relevant fact and credibility issues. Furthermore, because of their social or religious purposes, associations of this type may expel a member for divergent beliefs or for indecorous behavior, and where such issues are involved imposing incidents of a court hearing would ordinarily seem inappropriate."

briefly. Davenport was permitted to explain his defense during a brief question and answer period. Under all of the circumstances, the court cannot conclude that the procedures used were unreasonable or unfair as they relate to the charge involving the Metcalf book.

It is true that the role of Davenport's counsel was severely limited. As the defendant asserts, however, there is no principle of law that requires that a member of a fraternal organization be permitted to have legal counsel at an organizational meeting considering expulsion pursuant to its bylaws. The concept of "effective assistance of counsel" derives from the sixth amendment to the United States constitution, as the defendant notes, and applies to criminal matters, not expulsion proceedings such as the one at issue in the present case.

Davenport's claim that he was denied the "right" to confront and cross-examine witnesses requires discussion. It is true that the ground rules established did not provide for the calling and examining of witnesses, such as occurs at trial. This meant, however, that the defendant called no witnesses at the hearing. Everything the committee considered was distributed to committee members and the defendant. Davenport was permitted to speak and submitted statements from supporters. Moreover, aside from the question of whether Davenport ever actually received the detailed March 8, 1994 letter, the facts as to the Metcalf book issue were largely undisputed. But cf. *Gervasi* v. *Societa Giusippi Garibaldi*, supra, 96 Conn. 56, in which a fraternal society expelled a member at a meeting without notice and in which then Chief Justice Wheeler stated: "While the hearing on the charges is in progress, necessarily the accused must have the opportunity of being present and of presenting his defense. And as a rule the charge against the member cannot be substantiated without the testimony of witnesses."

Under all the circumstances, it cannot be said that the procedures used were unfair with regard to the Metcalf book allegation. Davenport had the opportunity to make the arguments available to him.

4

Miscellaneous Arguments

Davenport raises other arguments that require brief consideration. First, Davenport argues that because the incidents underlying the Metcalf book occurred some years ago, they are stale and should not be the basis for his expulsion. The bylaws contain nothing that is the rough equivalent of a statute of limitations. Therefore, the defendant was and should be free to consider relevant offending conduct whenever it chose to do so, and to expel Davenport, as long as the bylaws were "reasonable, germane to the purposes of the corporation, and equally enforced as to all members," as required by § 33-1056 (a).

Second, Davenport claims, in essence, that he considered the matter resolved because he was informed by letter dated October 28, 1996, from Little, chairman of the history committee, that the history committee was taking no action on Davenport's two proposals to dispose of the remaining copies of the Metcalf book, and would not consider any further action on the subject. The fact that Davenport considered the matter closed in his mind did not mean it was closed in the minds of members of the pertinent state societies or the General Society. Additionally, the letter refers to the society's decision to take "no action on either [of Davenport's] proposal[s] or consider any further action on the subject." The "subject" was the *disposal* of the books, not Davenport's conduct in having had them *reprinted.*

Finally, Davenport argues that the bylaws have not been "equally enforced as to all members." Noting that

Davenport "enjoys the dubious distinction" of being the only member ever expelled from the defendant, he relies upon an infamous example of conduct by a member of a state society to support this argument. Specifically, he notes that on July 11, 1804, Aaron Burr—then vice president of the United States and a member of the New York Society of the Cincinnati—killed Alexander Hamilton in a duel. At the time, Hamilton was the president general of the General Society, having succeeded George Washington on Washington's death in 1799. Burr was indicted for murder, yet he was not expelled from the New York Society. If Burr was not expelled for killing the president general of the society, Davenport argues, surely he ought not to be expelled for conduct which, by comparison, is innocuous.

This argument is flawed in at least two important respects, putting aside the tempestuous political environment surrounding that famous incident in American history. First, what members view as "conduct inconsistent with a gentleman and a man of honor" in one era may be viewed entirely differently in another. In 1999, dueling with pistols would surely be viewed as unacceptable conduct. In 1804, however, the failure or refusal to accept a challenge to duel was in itself widely viewed as dishonorable. Each generation must decide for itself what is acceptable and unacceptable, as long as the core meaning of the bylaw is honored. Second, the fact that certain individuals have not been expelled for what is arguably greater offending conduct does not necessarily, as a matter of logic, mean that other individuals ought not to be expelled for less offensive conduct. Providing one example of unpunished conduct, almost two centuries old, does not lead to an inference of unequal enforcement of the bylaws in this particular case. There is no evidence in the record from which it can be concluded that the bylaws have been

unequally applied to Davenport as compared with others.

Courts must tread lightly when faced with claims of this kind. A substantial amount of deference is owed to members of private nonstock corporations who make decisions of the sort under review here. Judges must avoid the temptation to intrude their own sensibilities into these situations in the absence of a strong, clear need to do so. "Courts must guard against unduly interfering with an organization's autonomy by substituting judicial judgment for that of the organization in an area where the competence of the court does not equal that of the organization." *Berke* v. *Hecht*, 208 Cal. App. 3d 463, 469, 257 Cal. Rptr. 738 (1989). Such decisions are best made by the persons closest to the situation, and with the most intimate understanding of the niceties of the issues involved, as long as those decisions conform to the legal principles cited previously, including statutory requirements. Except in unusual circumstances—or, of course, where the rights of protected categories of persons are involved—members of private societies should be fundamentally free to make their own rules, and associate with those who abide by those rules. The question is not whether someone outside the society, viewing the facts in hindsight, would have come to the same decision. The question, rather, is whether the decision reached by the members of the society, with their common interests, knowledge, sensibilities and goals, was reasonable in light of the facts known to them. In a free society, such decisions are more properly left to private individuals rather than government officials or judicial officers.

This means that there will inevitably be occasions when, from the outside looking in, decisions will be made by private groups and associations that may appear to the uninitiated to be idiosyncratic, petulant or harsh. Private associations that have expelled members

will simply have to accept the reality that their actions may be subject to criticism and censure. As Professor Zechariah Chafee, Jr., pungently notes in the opening two lines of his law review article on the subject; see footnote 7 of this opinion; "[t]he bitterness of a dispute is apt to be inversely proportional to the area of conflict. Family rows are proverbial for their violence." Z. Chafee, Jr., "The Internal Affairs of Associations Not for Profit," 43 Harv. L. Rev. 993 (1930). Further, he might have added, for the eccentricities they often reveal to the outside world.

Chafee also notes in his article, however, that in light of the high regard society places on the right of people to associate freely with like-minded individuals, "[l]egal supervision must often be withheld for fear that it may do more harm than good." Id., 1027.

Further, as Chafee states, in concluding his article: "Our reaction toward any particular dispute in a club or trade union or church or college is almost sure to be influenced by our inclination toward one side or the other in this undying controversy. We shall be a bit more favorable to judicial intervention if we believe that the state is the sole ruler of all that goes on within its borders, and is the necessary safeguard of the individual against the closely pressed tyranny of associations. We shall be more doubtful of the probable wisdom of state participation in the affairs of such a group if we are accustomed to think of the state itself as just one more kind of association, which, like the others, should keep to its own functions, and which must be judged according to the value and efficiency of the services it renders in return for rather high annual dues." Id., 1029.

## IV

## CONCLUSION

Given the circumstances of the present case, in consideration of the merits, the court cannot conclude that

Davenport has met his burden of demonstrating that the defendant's conduct in expelling him was unreasonable, unfair, or violative of § 33-1056 (a). Moreover, the balance of equities does not favor granting the relief requested. For all of the reasons previously stated, Davenport's application for a mandatory injunction restoring his membership in the defendant is denied.

## APPENDIX 1

## STIPULATION OF FACTS

The plaintiff and the defendant hereby stipulate that the following facts are true:

(1) Robert Ralsey Davenport (the plaintiff) is a resident of the state of California.

(2) The Society of the Cincinnati in the State of Connecticut (the defendant), a tax exempt charitable organization, is a hereditary society of lineal and collateral descendants and a Connecticut nonstock corporation specially charted by Special Acts 1895 No. 121 § 1 of the General Assembly, as amended by Special Acts 1984 No. 84-14 § 4.

(3) The defendant operates pursuant to and under its bylaws.

(4) The defendant is one of thirteen such state societies, one in each of the thirteen original states, which, together with a fourteenth society in France, comprise The General Society of the Cincinnati (The General Society). The General Society was created by a document entitled "The Institution of the Society of the Cincinnati," which was prepared and accepted by Officers of the American Army in Cantonment on Hudson's River on Tuesday, May 13, 1783, including General George Washington. A copy of The Institution of the Society of the Cincinnati is attached hereto.

(5) The General Society maintains as its national headquarters a mansion, museum and library, known as Anderson House, in Washington D.C. for the use of its members and their guests, providing accommodations for lodging, socializing and conducting genealogical and historical research. The General Society operates pursuant to and under The Institution and the General Society's bylaws.

(6) The membership of the defendant consists of, and as a general rule is restricted to, males who are lineal descendants of officers who served in the Continental Army or Navy during the Revolutionary War.

(7) The plaintiff was, continuously from 1977 until February 15, 1999, a member in good standing of the defendant, having joined in the right of his ancestor, Lieutenant Hezekiah Davenport.

(8) In December, 1998, after the defendant had been advised of certain instances of conduct of the plaintiff alleged not to be consistent with membership in the defendant, the defendant commenced a process to determine whether to expel the plaintiff from the defendant, pursuant to Article 25 of its bylaws, by reason of such conduct. David Franklin Musto, M.D., the president of the defendant, appointed a committee chaired by David W. Dumas and composed also of Atwood Collins, II and Jay W. Jackson, all Connecticut attorneys, to inquire into the matter (the committee).

(9) By letter dated December 23, 1998, Dumas, the chairman of the committee, wrote the plaintiff a letter.

(10) The plaintiff responded by letter dated January 7, 1999.

(11) By letter dated January 13, 1999, counsel for the plaintiff wrote to Dumas enclosing the sworn response of the plaintiff, which in turn enclosed various documents.

(12) The committee, by letter to Musto dated January 14, 1999, recommended that the plaintiff be expelled from membership in the defendant for conduct "inconsistent with membership in 'One Society of Friends,'" on the following grounds:

"a. That you caused to be reprinted Bryce Metcalf's *Original Members and Other Officers Eligible to the Society of the Cincinnati, 1783–1938,* including the copyrighted insigne and name of the Society, without authorization from the Society and indeed over its objections; and

"b. That you were asked to leave Anderson House by then Vice President George Raiford in April 1997 by reason of your treatment of several members of the staff, and that your use of Anderson House was and remains suspended."

(13) By letter dated January 15, 1999, Musto sent a copy of the report of the committee to the plaintiff and a copy to his counsel.

(14) By letter dated January 19, 1999, counsel for the plaintiff wrote to Dumas requesting documents.

(15) By letter dated January 22, 1999, Dumas responded to the aforementioned letter dated January 19, 1999 from the plaintiff's counsel identifying exhibits to be presented at the special meeting of the defendant which would consider the expulsion of the plaintiff from the defendant.

(16) Pursuant to the call of the president of the defendant, dated January 25, 1999, mailed only to members of the defendant, a special meeting (the special meeting) of the membership of the defendant was scheduled to be held at the Quinnipiack Club in New Haven, Connecticut on February 15, 1999 to determine whether to adopt the expulsion recommendation of the committee.

(17) By letter dated January 27, 1999, counsel for the plaintiff responded to the letter dated January 22, 1999 from Dumas.

(18) By letter to counsel for the plaintiff dated February 5, 1999, Dumas in turn, responded to the letter from the plaintiff's counsel dated January 27, 1999.

(19) In addition, as noted in Dumas' letter dated February 15, 1999, the staff of Anderson House was instructed by the president of the General Society not to speak with the plaintiff or his attorney in advance of the special meeting.

(20) By letter dated February 8, 1999, counsel for the plaintiff wrote to Dumas enclosing two documents which ultimately were placed in the packet.

(21) By letter dated February 10, 1999, counsel for the plaintiff wrote to Dumas enclosing another document which ultimately was placed in the packet.

(22) The special meeting was held as and where scheduled on February 25, 1999. A certified verbatim transcript of the special meeting was prepared by a court reporter who was in attendance.

(23) An agenda for the special meeting was prepared.

(24) Each member of the defendant in attendance at the special meeting received a packet of documents, and a copy of a letter from the plaintiff, dated February 10, 1999, which the plaintiff read into the record during the course of the special meeting.

(25) The defendant established procedural rules for the special meeting.

(26) The special meeting was conducted in accordance with the procedural rules, although the plaintiff was allowed to complete reading his response when the twenty minute limit expired. The defendant also

stated that the meeting was being conducted under Robert's Rules of Order.

(27) After the presentation and questions concluded, Musto allowed the plaintiff to cast a vote against his own expulsion and then required him and his counsel to leave the room while the remaining seventeen members in attendance discussed the matter behind closed doors and voted by secret written ballot, which was explained to the plaintiff to be in accordance with the applicable provisions of Robert's Rules of Order.

(28) The seventeen members attending the special meeting, other than the plaintiff, voted unanimously to expel the plaintiff.

(29) Immediately following the adjournment of the special meeting, a member of the committee orally informed the plaintiff that the only publication of the action of the special meeting would state that the plaintiff was no longer a member of the defendant as of February 15, 1999, and that his expulsion and the facts attendant thereto would not be publicized.

(30) By letter dated February 18, 1999, Dumas sent counsel for the plaintiff a letter the defendant's secretary had written to the secretary of the General Society dated February 16, 1999.

(31) The loss of the plaintiff's membership in the defendant by expulsion leaves a vacancy which can be filled by another descendant claiming eligibility in the right of Lieutenant Hezekiah Davenport. If the vacancy is filled, the plaintiff would be excluded permanently from membership in the defendant.

(32) The defendant is unable to determine whether any member other than the plaintiff has ever been expelled from the defendant.

## APPENDIX 2

### The Institution of the Society of the Cincinnati

"It having pleased the Supreme Governor of the Universe, in the disposition of human affairs, to cause the separation of the colonies of North America from the domination of Great Britain, and, after a bloody conflict of eight years, to establish them free, independent and sovereign States, connected, by alliances founded on reciprocal advantage, with some of the great princes and powers of the earth.

"To perpetuate, therefore, as well the remembrance of this vast event, as the mutual friendships which have been formed under the pressure of common danger, and, in many instances, cemented by the blood of the parties, the officers of the American Army do hereby, in the most solemn manner, associate, constitute and combine themselves into one SOCIETY OF FRIENDS, to endure as long as they shall endure, or any of their eldest male posterity, and, in failure thereof, the collateral branches who may be judged worthy of becoming its supporters and Members.

"The officers of the American Army having generally been taken from the citizens of America, possess high veneration for the character of that illustrious Roman, Lucius Quintus Cincinnatus; and being resolved to follow his example, by returning to their citizenship, they think they may with propriety denominate themselves—

### The Society of the Cincinnati

*"The following principles shall be immutable and form the basis of the Society of the Cincinnati:*

"AN INCESSANT ATTENTION TO PRESERVE INVIOLATE THOSE EXALTED RIGHTS AND LIBERTIES OF HUMAN NATURE, FOR WHICH THEY HAVE FOUGHT AND BLED, AND WITHOUT WHICH THE HIGH RANK OF A RATIONAL BEING IS A CURSE INSTEAD OF A BLESSING.

"An unalterable determination to promote and cherish, between the respective States, that union and national honor so essentially necessary to their happiness, and the future dignity of the American empire.

"To render permanent the cordial affection subsisting among the officers. This spirit will dictate brotherly kindness in all things, and particularly, extend to the most substantial acts of beneficence, according to the ability of the Society, towards those officers and their families, who unfortunately may be under the necessity of receiving it.

"The General Society will, for the sake of frequent communications, be divided into State Societies, and these again into such districts as shall be directed by the State Society.

"The Societies of the districts to meet as often as shall be agreed upon by the State Society, those of the State on the fourth day of July annually, or oftener, if they shall find it expedient, and the General Society on the first Monday in May, annually, so long as they shall deem it necessary, and afterwards, at least once in every three years.

"At each meeting, the principles of the Institution will be fully considered, and the best measures to promote them adopted.

"The State Societies will consist of all the members resident in each State respectively; and any member removing from one State to another, is to be considered, in all respects, as belonging to the Society of the State in which he shall actually reside.

"The State Societies to have a President, Vice-President, Secretary, Treasurer, and Assistant Treasurer, to be chosen annually, by a majority of votes, at the State meeting.

"Each State meeting shall write annually, or oftener, if necessary, a circular letter, to the State Societies, noting whatever they may think worthy of observation,

respecting the good of the Society, or the general union of the States, and giving information of the officers chosen for the current year; copies of these letters shall be regularly transmitted to the Secretary-General of the Society, who will record them in a book to be assigned for that purpose.

"The State Society will regulate everything respecting itself and the Societies of its districts consistent with the general maxims of the Cincinnati, judge of the qualifications of the members who may be proposed, and expel any member who, by a conduct inconsistent with a gentleman and a man of honor, or by an opposition to the interest of the community in general, or the Society in particular, may render himself unworthy to continue a member.

"In order to form funds which may be respectable, and assist the unfortunate, each officer shall deliver to the Treasurer of the State Society one month's pay, which shall remain for ever to the use of the State Society; the interest only of which, if necessary, to be appropriated to the relief of the unfortunate.

"Donations may be made by persons not of the Society, and by members of the Society, for the express purpose of forming permanent funds for the use of the State Society, and the interest of these donations appropriated in the same manner as that of the month's pay.

"Moneys, at the pleasure of each member, may be subscribed in the Societies of the districts, or the State Societies, for the relief of the unfortunate members, or their widows and orphans, to be appropriated by the State Society only.

"The meeting of the General Society shall consist of its officers and a representation from each State Society, in number not exceeding five, whose expenses shall be borne by their respective State Societies.

"In the general meeting, the President, Vice-President, Secretary, Assistant Secretary, Treasurer, and

Assistant Treasurer-Generals, shall be chosen, to serve until the next meeting.

"The circular letters which have been written by the respective State Societies to each other, and their particular laws, shall be read and considered, and all measures concerted which may conduce to the general intendment of the Society.

"It is probable that some persons may make donations to the General Society, for the purpose of establishing funds for the further comfort of the unfortunate, in which case, such donations must be placed in the hands of the Treasurer-General, the interests only of which to be disposed of, if necessary, by the general meeting.

"All the officers of the American army, as well as those who have resigned with honor, after three years' service in the capacity of officers, or who have been deranged by the resolution of Congress upon the several reforms of the army, as those who shall have continued to the end of the war, have the right to become parties to this institution; provided that they subscribe one month's pay, and sign their names to the general rules, in their respective State Societies, those who are present with the Army immediately; and others within six months after the Army shall be disbanded, extraordinary cases excepted; the rank, time of service, resolution of Congress by which any have been deranged, and place of residence must be added to each name— and as a testimony of affection to the memory and the offspring of such officers as have died in the service, their eldest male branches shall have the same right of becoming members, as the children of the actual members of the Society.

"Those officers who are foreigners, not resident in any of the States, will have their names enrolled by the Secretary-General, and are to be considered as members in the Societies of any of the States in which they may happen to be.

"And as there are, and will at all times be, men in the respective States eminent for their abilities and patriotism, whose views may be directed to the same laudable objects with those of the Cincinnati, it shall be a rule to admit such characters, as Honorary Members of the Society, for their own lives only: Provided always, That the number of Honorary Members, in each State, does not exceed a ration of one to four of the officers or their descendants.

"Each State Society shall obtain a list of its members, and at the first annual meeting, the State Secretary shall have engrossed, on parchment, two copies of the Institution of the Society, which every member present shall sign, and the Secretary shall endeavor to procure the signature of every absent member; one of those lists to be transmitted to the Secretary-General, to be kept in the archives of the Society, and the other to remain in the hands of the State Secretary. From the State lists, the Secretary-General must make out, at the first general meeting, a complete list of the whole Society, with a copy of which he will furnish each State Society.

"The society shall have an Order, by which its members shall be known and distinguished, which shall be a medal of gold, of a proper size to receive the emblems, and suspended by a deep blue riband two inches wide, edged with white, descriptive of the union of France and America, viz.:

"The principal figure,

Cincinnatus:

Three Senators presenting him with a sword and other military ensigns — on a field in the background, his wife standing at the door of their Cottage — near it.
A PLOUGH AND INSTRUMENTS OF HUSBANDRY.

Round the whole,
OMNIA RELINQUIT SERVARE REMPUBLICAM.

On the reverse,
Sun rising—a city with open gates, and vessels entering the port—Fame
crowning CINCINNATUS with a wreath, inscribed
VIRTUTIS PRAEMIUM.

Below,
HANDS JOINED, SUPPORTING A HEART
With the motto,
ESTO PERPETUA.

Round the whole,
SOCIETAS CINCINNATORUM INSTITUTA.
A. D. 1783."

Except from the minutes of the triennial meeting of the General Society, held in the City of Baltimore on May 18, 1854:

"*Resolved.* That each State Society shall have the full right and power to regulate the admission of members, both as to qualifications of members and the terms of admission. Provided, that the admission be confined to the male descendants of original members (including collateral branches as contemplated by the original Constitution), or to the male descendants of such officers of the Army and Navy as may have been entitled to admission, but who failed to avail themselves thereof within the time limited by the Constitution; or to the male descendants of such officers of the Army and Navy of the Revolution as may have resigned with honor, or left the service with reputation, or to the male collateral relative of any officer who died in service without leaving issue."